T.C. Memo. 2016-49

UNITED STATES TAX COURT

JAMES T. O'NEAL, JR., AND SALLY L. O'NEAL, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 3648-10.                                   Filed March 14, 2016.

James T. O'Neal, Jr., and Sally L. O'Neal, pro sese.

Laura A. Price, Mark J. Tober, and Lauren B. Epstein, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

NEGA, <u>Judge</u>:  By notice of deficiency dated November 6, 2009,

respondent determined deficiencies and penalties with respect to petitioners'

Federal income tax as follows:[1]

_____

[1]All section references are to the Internal Revenue Code (Code) in effect at
(continued...)

| [*2] Year | Deficiency | Penalty sec. 6663(a) | Addition to tax sec. 6651(a)(1) |
|---|---|---|---|
| 1994 | $92,260 | $69,195 | -- |
| 1995 | 341,497 | 256,123 | -- |
| 1996 | 357,357 | 268,018 | -- |
| 1997 | 1,168,411 | 876,308 | -- |
| 1998 | 516,579 | 387,434 | $128,942 |

The issues for decision are:

(1) whether the periods of limitations for assessment of petitioner's income tax liabilities remain open for tax years 1994-98;

(2) whether petitioners failed to report taxable income of $286,091, $924,603, $964,326, $3,019,208, and $1,376,697 on their 1994-98 Federal income tax returns, respectively;

(3) whether petitioners are entitled to net operating loss (NOL) carryforward deductions of $6,101,509, $6,091,822, $6,087,370, $6,086,170, and $6,084,165 for tax years 1994, 1995, 1996, 1997, and 1998, respectively;

(4) whether petitioners are liable for fraud penalties pursuant to section 6663 for tax years 1994-98; and

---

[1](...continued)
all relevant times. All Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are rounded to the nearest dollar.

**[*3]**  (5) whether petitioners are liable for the addition to tax pursuant to section 6651(a)(1) for tax year 1998.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.  Petitioners were married and resided in Florida at the time they filed their petition.

Petitioners James T. O'Neal, Jr. (petitioner), and Sally L. O'Neal were married in 1967 and have four children together:  James T. O'Neal III (J.T.), Kelly O'Neal, Kathleen O'Neal (Katie), and Patrick O'Neal.

I.  Petitioners' Income and Losses Before Tax Years at Issue

A.  Petitioner's Business Dealings and Theft

In the mid-1970s petitioners joined the Bay Hill Club and Lodge (Bay Hill Club), a private golf resort located in Bay Hill, Florida.  In 1975 petitioners became acquainted with Arnold Palmer, a professional golfer.  Petitioner and Mr. Palmer became friends and golfing partners.  In 1977 Mr. Palmer introduced petitioner to Mark McCormack, Mr. Palmer's business partner and agent.  Mr. McCormack was the founder and chairman of International Management Group (IMG), an international management company that represents professional athletes and other celebrities.

**[*4]**   Petitioner's friendship with Messrs. Palmer and McCormack developed into a business relationship over the years.  Beginning in 1979, petitioner was involved with Arnold Palmer's automobile dealerships.  In 1988, 1989, and 1990 petitioner and Messrs. Palmer and McCormack were each one-third shareholders in five subchapter S corporations that were in the business of selling automobiles: Arnold Palmer Motors, Inc., Arnold Palmer Ford Lincoln Mercury, Inc., Fairway Ford, Inc., PMO Motors of Kentucky, Inc., and Nugget Motors of California, Inc. (collectively, Arnold Palmer dealerships).  Petitioner managed the daily operations of these dealerships.  Messrs. Palmer and McCormack were not involved in day-to-day operations.

Petitioner began siphoning money from Arnold Palmer Motors, Inc., as early as October 1985.  When one dealership ran short on cash, petitioner transferred money from another dealership to cover the shortfall.  Rather than transferring funds directly between dealership accounts, petitioner routed transfers through his personal bank account.  Petitioner routinely kept some of the transferred funds in his own account instead of transferring them to the appropriate dealership.  Messrs. Palmer and McCormack did not authorize petitioner to take money from the dealerships.  On October 15, 1985, petitioner signed a demand promissory note (October 1985 promissory note) in favor of

**[*5]** Arnold Palmer Motors, Inc., reflecting the amounts he had taken from the dealership. Petitioner updated the promissory note from time to time. An attachment to the October 1985 promissory note reflects that as of December 31, 1986, petitioner had taken at least $287,000 from the dealership.

In the spring of 1989 an Arnold Palmer dealership in South Carolina lost its financing source, Ford Motor Credit Co. (Ford Motor Credit). Petitioner accepted responsibility for the financial troubles of the dealership and promised Messrs. Palmer and McCormack that he would reimburse them for any money that had been lost. Petitioner also informed Messrs. Palmer and McCormack that he had borrowed approximately $2 million from the dealerships. Upon learning of petitioner's misappropriations, IMG audited the dealerships' records to determine the extent of petitioner's theft. The IMG audit discovered that petitioner had in fact taken more than $6 million from the dealerships. On April 30, 1989, petitioner executed an indemnity and security agreement in favor of Messrs. Palmer and McCormack which granted a security interest in all of his assets to Messrs. Palmer and McCormack. On May 31, 1989, petitioner executed a demand promissory note in favor of Fairway Ford, Inc. (Fairway Ford note), in the amount of $6,056,862 in repayment of the amount he had taken from the dealerships.

**[\*6]** Glen Blackburn, a former certified public accountant (C.P.A.) for the Arnold Palmer dealerships, testified at trial. However, there is no evidence as to the specific years in which any payments were made on the Fairway Ford note or any specific amounts of such payments, only that they occurred in the "early 90's". Mr. Blackburn's testimony was not substantiated by any documentation regarding the dates or amounts of transfers of funds from petitioners to Messrs. Palmer and McCormack. While petitioners transferred their Isleworth home, discussed in further detail below, to Messrs. Palmer and McCormack for a purchase price of $4 million, the record is unclear as to whether any money actually changed hands as part of the transfer of the Isleworth home, and the exchange was not substantiated by any documentation. Petitioner was removed from any ownership interests in the Arnold Palmer dealerships in 1990. Mrs. O'Neal subsequently returned to work to support the family in 1992.

B. <u>Loan to Dealerships</u>

After the South Carolina dealership lost financing, petitioner and Messrs. Palmer and McCormack executed a promissory note on July 2, 1990,[2] in favor of Ford Motor Credit in the amount of $10.4 million (July 1990 promissory note) in

---

[2]It is unclear from the record whether petitioner still had an ownership interest in the Arnold Palmer dealerships when he signed the July 1990 promissory note.

[*7] order to personally guarantee further credit from Ford Motor Credit. The proceeds of the promissory note were directly invested in Arnold Palmer Ford Lincoln Mercury, Inc., and treated as a contribution to capital. Petitioner and Messrs. Palmer and McCormack were each allotted one-third of the total contribution. Petitioner never made any payments toward the $10.4 million loan from Ford Motor Credit, and Messrs. Palmer and McCormack ended up making equal payments toward the loan. Ford Motor Credit looked to Messrs. Palmer and McCormack for guaranties first and would not have entered into the agreement to provide credit if Messrs. Palmer and McCormack had not signed the July 1990 promissory note.

On August 1, 1992, petitioner and Messrs. Palmer and McCormack executed an amended and restated note in favor of Pittsburgh National Bank in the amount of $10,230,362 (August 1992 promissory note). The note was an amendment and restatement of four loans previously made to petitioner and Messrs. Palmer and McCormack in 1989. These four loans were used to capitalize Arnold Palmer Motors, Inc., and Fairway Ford, Inc., and treated as a shareholders' contribution to capital. Each shareholder was allotted one-third of the total contribution. Petitioner never made any payments toward the loans from Pittsburgh National Bank, and Messrs. Palmer and McCormack paid off the loans.

[*8]   C.   Petitioners' Properties

In 1989 petitioners owned property known as the Bay Hill Farm that was located across the street from the Bay Hill Club subdivision in Bay Hill, Florida. Petitioners kept various farm animals at the Bay Hill Farm, including a horse ridden by one of their daughters, goats, a miniature horse named Smurf, and two llamas named Leroy and Lollipop. Petitioner's personal assistant worked in an office located at the Bay Hill Farm. On August 21, 1989, petitioners sold the Bay Hill Farm to Mr. Palmer for $1 million. Consideration for the property consisted of $500,000 to be rendered at closing and forgiveness of $500,000 owed by petitioner to Mr. Palmer "on a certain Judgment Note". Petitioners continued to keep their animals at the Bay Hill Farm after the sale to Mr. Palmer in 1989. Additionally, two individuals who worked for petitioner resided at the farm for some time. Mr. Palmer filed suit against petitioners in 1994 to evict the two individuals and the farm animals from the Bay Hill Farm.

From 1987 to 1989 petitioners constructed a 28,000-square-foot home at 9766 Green Island Cove in the Isleworth subdivision in Windermere, Florida. Petitioners paid Thomas Coudriet $1.4 million to build the house, which was modeled on the clubhouse at the Augusta National Golf Club. Some of the checks petitioners used to pay Mr. Coudriet were from the checking account belonging to

**[*9]** Arnold Palmer Motors, Inc.  In the summer of 1989 petitioners owed Mr. Coudriet between $300,000 and $400,000 to complete construction of the Isleworth house.  Petitioner asked Mr. Palmer for a loan to finish construction on the house, and Mr. Palmer lent petitioners $1 million in August 1989 to finance the remaining construction costs.  It is unclear to the Court whether Mr. Palmer's August 1989 $1 million loan to petitioners was related to his purchase of the Bay Hill Farm from petitioners for $1 million in August 1989.

D.    Petitioners' 1988, 1989, and 1990 Tax Returns

Petitioners reported NOLs on their 1988, 1989, and 1990 Federal income tax returns.[3]  For tax year 1988 petitioners reported an NOL of $813,475 and an NOL carryforward of $568,352.  For tax year 1989 petitioners reported an NOL of $4,538,294, and an NOL carryover from prior years of $899,206, and an NOL carryforward of $5,294,098.  For tax year 1990 petitioners reported an NOL of $759,586, an NOL carryover from prior years of $5,440,317, and an NOL carryforward of $6,161,447.  The NOLs claimed by petitioners for 1988-90 totaled $6,111,355.  An addendum to petitioner's 1989 tax return titled "NOL" recites amounts of $34,896 for 1985, $25,539 for 1986, $122,028 for 1987, and $716,743

---

[3]The record does not contain copies of petitioners' tax returns for years prior to tax year 1988.

**[\*10]** for 1988, totaling $899,206, despite the 1988 tax return's reporting an NOL carryforward of only $568,352 and no NOL carryovers from prior years. Petitioners have not offered an explanation for why their 1989 tax return reports a carryover amount from prior years that is larger than the amount claimed as a carryforward in 1988, nor have they explained why their 1990 tax return reports a larger carryover amount from prior years than what was reported on their 1989 tax return. Petitioners did not report on their 1988 or 1989 income tax return any of the $6,056,862 petitioner had misappropriated from the Arnold Palmer dealerships.

E.    Judgments Against Petitioners

On April 9, 1991, a final summary judgment in the amount of $5,550,336 was entered against petitioners in the action entitled Sun Bank, N.A. v. APAG Holdings, Inc., Orange County, Florida, No. CI-90-9676.

On April 25, 1991, a final judgment in the amount of $300,731 was entered against petitioner in the action entitled Miller v. O'Neal, Orange County, Florida, No. CI-1228.

On December 2, 1991, a default judgment in the amount of $478,224 was entered against petitioner in the action entitled Bank One, Indianapolis, N.A. v. O'Neal, Hamilton County Superior Court, Indiana, No. 29D03-9107-CP-318.

[*11] On February 27, 1992, a default judgment in the amount of $11,313,377 plus any related costs was entered against petitioners in the action entitled Bank One, Indianapolis, N.A. v. O'Neal, Hamilton County Superior Court, Indiana, No. 29D03-9107-CP-318. The judgment was entered in favor of Messrs. Palmer and McCormack and related to petitioner's nonpayment toward the July 1990 promissory note.

In February 1994 petitioner was convicted by a jury in the State of Florida of two counts of State sales tax evasion. On May 17, 1994, petitioner was ordered to pay restitution and investigation costs of $389,526 to the State of Florida pursuant to this conviction.

The above-described judgments against petitioner individually and petitioners jointly total in excess of $18 million. Petitioners have never made any payments toward the $11,313,377 judgment entered against them in favor of Messrs. Palmer and McCormack. As a result of these judgments, petitioners were insolvent from 1994 through 1998, the tax years at issue.

II.    Business Dealings During Tax Years at Issue

A.    Fee Agreement With Patrick Baker

In 1990 petitioner was the sole shareholder of Arnold Palmer Automotive Group Holdings, Inc. (APAG Holdings). APAG Holdings wholly owned Arnold

[*12] Palmer Automotive Group of Orlando, Inc. (APAG Orlando). In the early 1990s petitioner, APAG Holdings, and APAG Orlando were plaintiffs in a lawsuit against General Motors, Inc. (GMC), and General Motors Acceptance Corp. (GMAC).

Petitioner met Patrick Baker in either 1992 or 1993. On May 19, 1994, Mr. Baker agreed to fund petitioner's lawsuit against GMC and GMAC by paying for legal fees and petitioner's living expenses in exchange for receipt of any proceeds resulting from the litigation (1994 fee agreement). The lawsuit ended in 1994 in favor of GMC and GMAC. Petitioner did not inform Mr. Baker of the status of the lawsuit, and he never asked Mr. Baker to pay any of his living expenses.

B. Baker O'Neal Holdings, Inc., and American Public Automotive Group, Inc.

1. Overview of Companies' Purpose

Shortly after meeting Mr. Baker, petitioner pitched him the idea of creating a publicly traded corporation that would operate automobile malls. A witness compared the concept to Carmax, with locations offering numerous automobile brands to customers. Petitioner and Mr. Baker formed Baker O'Neal Holdings, Inc. (BOH), on December 6, 1993. At the time Mr. Baker had some personal wealth from the recent sale of a family business, and he invested approximately

**[\*13]** $400,000 into BOH. Mr. Baker was the sole shareholder of BOH, and petitioner served as the president of BOH from its incorporation until September 2, 1998. American Public Automotive Group, Inc. (APAG), was incorporated on December 27, 1995. BOH was the sole shareholder of APAG, and as with BOH, petitioner served as the president of APAG from its inception until September 2, 1998. Mr. Baker was aware of petitioner's prior business involvement with Messrs. Palmer and McCormack, but petitioner never apprised Mr. Baker of the judgments entered against him and his wife that exceeded $18 million.

BOH and APAG were organized for the purpose of developing and operating automobile dealerships to be located in and around shopping malls (auto malls). To achieve this purpose, APAG endeavored to purchase several automobile dealerships from Donald Massey, a Detroit-area automobile dealer, and raised capital by soliciting private investors. Rather than issuing stock to investors, APAG memorialized each investment with a promissory note. The promissory notes bore interest at a rate of 8% less transaction expenses not to exceed 10% of the outstanding amount of each note. Petitioner and Mr. Baker gave each investor a personal guaranty in which they agreed to guarantee the payment of all indebtedness of APAG. APAG promised investors that their money would be converted to shares of APAG stock upon the earlier of the date

[*14] APAG entered into a definitive agreement with Mr. Massey to acquire his dealerships or a date certain set forth in each financing letter. Eventually, APAG planned to execute an initial public offering.

APAG sought investments only from individuals who were accredited investors as that term is defined by the Securities and Exchange Commission. Investors were told their funds were being held in an escrow account. A total of $16,797,000 in investor money was deposited into APAG's bank account from 1995 to 1998. At an investor meeting in March 1998, an investor asked about the status of money that had been raised up to that point. Petitioner told investors that approximately $1 million had been spent on expenses, $2.5 million had been deposited with Mr. Massey, and the rest of the funds were in APAG's bank account. At the time the meeting was held, APAG had received investor deposits totaling $16,597,000.[4] Subtracting the amounts petitioner represented had been spent on expenses and deposited with Mr. Massey, APAG should have had approximately $13,097,000 in its bank account. However, as of April 1, 1998, BOH and APAG bank accounts held a total of only $1,688,232. In total, $11,408,768 was missing from the accounts.

---

[4]APAG received one additional investment of $200,000 after this meeting was held.

[*15]      2.      Petitioners' Theft From BOH and APAG

Petitioner never drew a salary as president of BOH or APAG. Petitioner's family members, including his father, wife, and four children, also did not receive salaries from BOH or APAG since they never worked for either company. Beginning in 1994 and continuing through his dismissal as president of BOH and APAG on September 2, 1998, petitioners used BOH and APAG funds for all of their personal expenses. Both petitioners were aware that this was done, in part, to defeat their creditors by not placing assets in their own names.

As he had previously done during his tenure with Arnold Palmer Motors, Inc., petitioner executed a demand promissory note in favor of BOH on October 6, 1995 (October 1995 promissory note). The October 1995 promissory note signed in favor of BOH is nearly identical to the October 1985 promissory note signed in favor of Arnold Palmer Motors, Inc., with the only differences being the dates, the holders of the notes, and the witnesses. The October 1995 promissory note contains an attachment that is similar to the attachment used for the October 1985 promissory note. The attachment reflects that petitioner had taken more than $3 million from BOH from 1994 to 1997. Additionally, petitioner disguised the taking of BOH and APAG funds by categorizing them as loans in BOH's general ledger.

**[*16]**           a.     <u>Credit Cards and Bank Accounts</u>

From 1994 to 1998, petitioners and their children freely spent BOH and APAG money. Petitioners, J.T., Kelly, and Katie each had BOH corporate American Express credit cards in their names which they used for personal expenses. Additionally, petitioner directed BOH to pay the personal credit card bills of Mrs. O'Neal, J.T., Kelly, and Katie. Petitioner created bank accounts in the names of three of his children, J.T., Kelly, and Katie, into which he deposited BOH and APAG funds. Petitioners each took steps to hide BOH and APAG money in their children's names. For example, in the summer of 1997, Mrs. O'Neal took Katie to National City Bank and deposited approximately $30,000 of BOH and APAG funds into an account titled in Katie's name. Mrs. O'Neal returned with Katie in May 1998 and withdrew the funds. Petitioner also took Katie to two banks to deposit BOH and APAG funds in accounts created in her name and later returned to withdraw the funds.

Mrs. O'Neal directed the BOH accountant, Paul Mohabir, to pay her personal expenses using BOH funds. In 1994 and 1995 petitioner wrote checks payable to Mrs. O'Neal on BOH's checking account to pay their daily living expenses. In 1994, 1995, and 1996 Mrs. O'Neal also wrote checks on BOH's checking account to pay personal expenses.

**[\*17]**           b.     Gifts, Automobiles, and Vacations

Petitioners and their children drove various automobiles that were purchased or leased with BOH funds. Mrs. O'Neal planned three cruises, all paid for with BOH money, for various individuals, including her parents, petitioners' children, and the children's significant others and friends. For Christmas in 1997 petitioner gave Mrs. O'Neal a check for $50,000 and each of his children and his father checks for $10,000, all of which were drawn on BOH's bank account. Mrs. O'Neal returned the $50,000 check to petitioner as she said she felt it was an inappropriate gift.

           c.     Children's Education

Petitioner used BOH funds to pay for his children's educations and living expenses. On January 12, 1998, petitioner paid off J.T.'s student loans incurred for undergraduate and juris doctor degrees by transferring $53,005 from BOH's bank account to the Department of Education. Petitioner also used BOH funds to pay for J.T.'s bar exam preparation course. When J.T. was accepted to New York University School of Law to complete an LL.M. in taxation, petitioner transferred $142,000 to J.T. ostensibly to cover the cost of tuition and housing in New York City. Mr. Baker specifically denied petitioner's request that BOH cover the costs associated with J.T.'s schooling. Petitioner also wrote checks for Kelly's tuition

[*18] and rent while she was at college and wrote checks to cover the cost of tutoring for Patrick.

Mrs. O'Neal also used BOH funds for the children's schooling. Mrs. O'Neal wrote checks on BOH's checking account for both J.T.'s and Kelly's tuition. She also wrote checks for Kelly's rent and wrote a check to Katie's high school for $275 for Katie's yearbook.

### d. Real Estate Purchases

Petitioners also used BOH and APAG money to purchase various real properties, none of which had any relationship to the companies' mission of creating a publicly traded auto mall corporation. On July 29, 1994, petitioner caused BOH to purchase 12321 Creekwood Lane in Carmel, Indiana, for $239,886 from friends, Thomas and Barbara Harris. Petitioners had previously owned 12321 Creekwood Lane and had defaulted on their mortgage; the Harrises had purchased the property at a sheriff's sale. In conjunction with BOH's purchase of 12321 Creekwood Lane, petitioner issued checks totaling $75,000 on BOH's checking account to Mr. Harris to repay him for personal loans in the same amount.

In 1994 petitioners purchased the Smurf Farm in J.T.'s and Kelly's names, named after the miniature horse that petitioners had previously housed at the Bay

[*19] Hill Farm. After Mr. Palmer evicted petitioners from the Bay Hill Farm, they moved their personal buildings and animals to the Smurf Farm. Petitioners hired Eric Reid to live on the Smurf Farm and look after their animals. Checks to Mr. Reid were written on BOH's checking account. Petitioners visited the Smurf Farm with their children on Sundays; except for one visit by Mr. Baker, BOH employees never visited the farm. On May 23, 1994, petitioner executed a quitclaim deed on behalf of J.T. and Kelly transferring the Smurf Farm to Mr. Baker. On December 22, 1997, petitioner used a check for $146,446 from BOH's checking account to make final payment for the Smurf Farm. Petitioners also hired Richard Henderson to perform maintenance and improvements to the various farms as well as their personal residence, petitioner's father's residence, and 9090 Bay Hill Boulevard (discussed in further detail below). Mr. Henderson was paid with checks from BOH's checking account, despite invoices' being addressed to petitioner personally.

Petitioners purchased five other farms with BOH funds. On December 27, 1995, petitioner purchased the Alba Farm for $206,326 using BOH's checking account and titled it in BOH's name. On June 20, 1995, petitioner made a downpayment on the Deese Farm by executing a check for $25,004 from BOH's checking account. On February 8, 1996, petitioner made a second payment on the

[*20] Deese Farm by executing a $25,000 check on BOH's checking account. On January 23, 1997, petitioner used a check for $99,941 from BOH's checking account to make final payment for the Deese Farm. The owners of the Deese Farm transferred it to BOH on February 7, 1997. Other farms purchased with BOH money include: (1) the Brannan Farm in 1997 for $44,636, (2) the Poiret Farm in 1997 for $30,642, and (3) the Walser Farm in 1998 for $29,957.

After Mr. Palmer evicted petitioners from the Bay Hill Farm in 1994, petitioner moved his personal office to 8484 Bay Hill Boulevard, Orlando, Florida, a house owned by petitioner's good friend Julian Laughinghouse. Petitioner conducted his personal affairs as well as BOH/APAG business from 8484 Bay Hill Boulevard from 1994 to 1998. In 1995 Mr. Laughinghouse filed two separate lawsuits against petitioner to evict him from 8484 Bay Hill Boulevard for failure to pay rent and for failure to repay a $100,000 loan. Mr. Laughinghouse withdrew the lawsuits on July 27, 1995. In September, November, and December 1995 petitioner executed checks totaling $75,012 on BOH's checking account made payable to Mr. Laughinghouse.

Mr. Laughinghouse also owned 9090 Bay Hill Boulevard, Orlando, Florida, which he used as his personal residence. On July 30, 1997, petitioner entered into an agreement with Mr. Laughinghouse to have BOH purchase the residences at

[*21] 8484 Bay Hill Boulevard and 9090 Bay Hill Boulevard.  Mr. Laughinghouse transferred 9090 Bay Hill Boulevard to BOH, subject to a life interest for himself, via warranty deed on July 30, 1997.  The warranty deed reflects that Mr. Laughinghouse was paid $900,000 for 9090 Bay Hill Boulevard.  On February 25, 1998, petitioner purchased a vacant lot adjacent to 8484 Bay Hill Boulevard using $144,934 in BOH funds.  The lot was zoned for residential use and had no business purpose.

On June 15, 1997, petitioners leased a condominium with BOH funds at 13565 Kensington Place in Carmel, Indiana, for personal use.  Petitioners had considered personally leasing 13565 Kensington Place as early as September 26, 1995.  In 1997 and 1998 petitioners spent $235,820 and $39,860 of BOH funds, respectively, on decorations and rent for 13565 Kensington Place.  Petitioner categorized the expenses associated with 13565 Kensington Place as "corporate condo expenses" in BOH's general ledger.  No BOH employees ever visited 13565 Kensington Place, but Mrs. O'Neal and the O'Neal children stayed there during summers and Christmas vacations.

3.    Petitioner's Dismissal From BOH and APAG

In late August 1998 Kevin Rankel, a financial adviser employed by BOH and APAG, discovered petitioners' extensive personal use of BOH and APAG

[*22] funds. Mr. Rankel resigned upon discovery of petitioners' use of BOH and APAG funds but not before showing a portion of the BOH general ledger to another BOH employee, Michael Quinn. Mr. Quinn immediately called Mr. Baker to the office. Messrs. Quinn and Baker discovered that petitioners had spent in excess of $10 million of BOH and APAG funds on nonbusiness expenses. Mr. Baker terminated petitioner's employment at BOH and APAG on September 2, 1998.

III. Aftermath of Petitioners' Management of BOH and APAG Funds

A. BOH and APAG Bankruptcies

On October 9, 1998, BOH and APAG filed voluntary petitions for relief pursuant to chapter 11 of title 11 of the United States Code. As part of the bankruptcy proceedings, BOH and APAG filed an adversary proceeding against petitioners and their four adult children, alleging that they had fraudulently transferred assets from BOH and APAG to themselves for personal use. On August 9, 2000, the bankruptcy court found in favor of BOH and APAG in the adversary proceeding and issued a final judgment against petitioner and findings of fact and conclusions of law and final judgment against Mrs. O'Neal, J.T., Kelly, and Katie. The bankruptcy court found that petitioners and J.T., Kelly, and Katie were fraudulent transferees of BOH and APAG. Further, the bankruptcy court

[*23] found that Mrs. O'Neal knowingly and actively participated in the scheme to fraudulently deplete BOH and APAG assets.

###### B.    Petitioner's Conviction

Special Agent Annette Waldon (SA Waldon) was assigned to investigate any tax-related crimes petitioner may have committed in relation to his spending of BOH's and APAG's money between 1994 and 1998.  SA Waldon determined that there were two components to petitioner's unreported income:  (1) income disguised as loans and (2) income classified as business expenses related to purchases of personal assets and expenses for those assets.  SA Waldon excluded from the second category certain automobiles that petitioner was able to prove were used for business purposes.  Petitioner cooperated with her investigation only after another target of the investigation began cooperating with the Government.

As a result of SA Waldon's investigation, petitioner was indicted by a grand jury on 49 counts of mail fraud, 30 counts of money laundering, and 3 counts of filing false income tax returns under section 7206(1) for tax years 1996, 1997, and 1998.  The grand jury determined that for tax years 1996 through 1998 petitioner willfully made and subscribed Forms 1040, U.S. Individual Income Tax Return, which he knew to be false, in violation of section 7206(1).  Further, the grand jury

**[*24]** determined that for tax year 1998, petitioner acted with intent to engage in conduct constituting a violation of sections 7201 and 7206.

On December 23, 2005, petitioner pleaded guilty to two counts of filing false income tax returns pursuant to section 7206(1) for tax years 1997 and 1998. In the plea agreement petitioner agreed that money categorized as loans and money disguised as business expenses were instead income to him. Petitioner agreed that he had received unreported income for the tax years at issue in the following amounts:

| Tax year | Income disguised as loans | Income disguised as business expenses | Total |
|---|---|---|---|
| 1994 | $211,091 | $75,000 | $286,091 |
| 1995 | 568,232 | 356,371 | 924,603 |
| 1996 | 746,886 | 217,440 | 964,326 |
| 1997 | 1,461,908 | 1,557,300 | 3,019,208 |
| 1998 | 507,513 | 869,184 | 1,376,697 |
| Total | 3,495,630 | [1]3,075,293 | 6,570,923 |

[1]All figures in this table were taken from petitioner's plea agreement. It is unclear why the plea agreement's calculation of the total amount of income disguised as business expenses and the total amount of unreported income is $2 less than the sum of these same amounts for 1994-98.

[*25] IV.    Petitioners' Tax Returns For 1994-98

Petitioners timely filed their 1994 tax return, in which they reported wages of $9,687 attributable to income earned by Mrs. O'Neal as a registered nurse and taxable interest income of $4.  Petitioners claimed a $3,000 capital loss and a $6,101,509 NOL carryover, reducing their income to -$6,094,818.

Petitioners timely filed their 1995 tax return, in which they reported wages of $4,452 attributable to income earned by Mrs. O'Neal as a registered nurse and taxable interest income of $186.  Petitioners claimed a $3,000 capital loss and a $6,091,822 NOL carryover, reducing their income to -$6,090,184.

Petitioners timely filed their 1996 tax return, in which they reported wages of $1,200 attributable to income earned by Mrs. O'Neal as a registered nurse, $9,472 in taxable distributions from retirement plans, and taxable interest income of $249.  Petitioners claimed a $3,000 capital loss and a $6,087,370 NOL carryover, reducing their income to -$6,079,449.

Petitioners timely filed their 1997 tax return, in which they reported wages of $2,868 attributable to income earned by Mrs. O'Neal as a registered nurse and taxable interest income of $325.  Petitioners claimed a $3,000 capital loss and a $6,086,170 NOL carryover, reducing their income to -$6,085,977.

**[*26]** Petitioners filed their 1998 tax return late on August 1, 2001, in which they reported wages of $2,005 attributable to income earned by Mrs. O'Neal as a registered nurse and taxable interest income of $503. Petitioners claimed a $3,000 capital loss and a $6,084,165 NOL carryover, reducing their income to -$6,084,657.

Petitioners failed to make any estimated tax payments for the 1994, 1995, 1996, 1997, and 1998 tax years.

## V. Notice of Deficiency

Respondent issued a notice of deficiency to petitioners on November 6, 2009, for tax years 1994 to 1998. The adjustments to income in the notice of deficiency are based on the amounts petitioner admitted to receiving as income in his plea agreement. Additionally, the notice of deficiency disallowed in full petitioners' NOL deductions carried forward from prior years.

OPINION

## I. Statute of Limitations

A deficiency in tax generally must be assessed within three years from the date on which the return was filed. See sec. 6501(a). However, if a taxpayer files a false or fraudulent return with the intent to evade tax, the tax may be assessed at any time. Sec. 6501(c)(1). Unless petitioners' returns for 1994-98 were made

[*27] falsely or fraudulently with the intent to evade tax, the periods of limitations on assessment and collection of petitioners' income tax for those years have expired.

Respondent bears the burden of proving an exception to the general limitations period. See Gould v. Commissioner, 139 T.C. 418, 431 (2012), aff'd, 552 F. App'x 250 (4th Cir. 2014); Harlan v. Commissioner, 116 T.C. 31, 39 (2001). Petitioner's guilty plea under section 7206(1) for intentionally filing false returns for tax years 1997 and 1998 does not in and of itself prove that section 6501(c) applies because the intent to evade tax is not an element of the crime charged under section 7206(1); however, a guilty plea under section 7206(1) may be considered in connection with other facts in determining whether an underpayment of tax was due to fraud. Wright v. Commissioner, 84 T.C. 636, 643-644 (1985). Respondent's burden of proof under section 6501(c)(1) is the same as his burden to prove applicability of the section 6663 civil fraud penalty, which is also at issue here. Gould v. Commissioner, 139 T.C. at 431; Browning v. Commissioner, T.C. Memo. 2011-261. To satisfy that burden, respondent must show by clear and convincing evidence that (1) an underpayment of tax exists, and (2) the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. See Sadler v.

[*28] Commissioner, 113 T.C. 99, 102 (1999); Parks v. Commissioner, 94 T.C. 654, 660-661 (1990).

Because we find that there are underpayments for tax years 1994-98, and further, that those underpayments are attributable to petitioners' fraudulent intent, the period of limitations for assessment of deficiencies in petitioners' income tax for the years at issue remains open.

II.    Deficiencies in Tax for Tax Years 1994-98

A finding of fraud under section 6663 requires us to first find that there was an underpayment of tax for each of the tax years in issue. This case also asks us to examine deficiencies in petitioners' income tax for the tax years at issue. For purposes of section 6663 and as relevant here, section 6664(a) defines the term "underpayment" in essentially the same terms as the term "deficiency" is defined by section 6211. See Feller v. Commissioner, 135 T.C. 497, 507 (2010) ("In a case involving a deficiency and fraud in which no excess withholding credits are claimed, * * * the terms 'deficiency' and 'underpayment' can be used interchangeably."); see also Rand v. Commissioner 141 T.C. 376, 386-387 (2013) ("Congress expressly indicated that uncoupling these terms was not intended to remove their definitional nexus."). As those terms are used here, an underpayment or deficiency is equal to the amount by which the tax imposed by the Code

[*29] exceeds the amount shown as the tax by petitioners on their return for each of the tax years at issue. See secs. 6211(a), 6664(a).

To prove an underpayment, the Commissioner is not required to establish the precise amount of the deficiency determined by him. DiLeo v. Commissioner, 96 T.C. 858, 873 (1991), aff'd, 959 F.2d 16 (2d Cir. 1992). However, he cannot meet his burden of proof by merely relying on the taxpayer's failure to prove error in the determination of the deficiency. Id. (citing Otsuki v. Commissioner, 53 T.C. 96, 106 (1969), and Pigman v. Commissioner, 31 T.C. 356, 370 (1958)). The deficiency determination does not enjoy its usual presumption of correctness unless the Commissioner establishes an underpayment by clear and convincing evidence. Id.; see also Parks v. Commissioner, 94 T.C. at 660-661 ("We must be careful in such cases not to bootstrap a finding of fraud upon a taxpayer's failure to prove respondent's deficiency determination erroneous.").

The Commissioner may prove an underpayment by proving a likely source of the unreported income. DiLeo v. Commissioner, 96 T.C. at 873. Alternatively, where the taxpayer alleges a nontaxable source of income, the Commissioner may satisfy his burden by disproving the nontaxable source so alleged. Id. at 873-874. Respondent argues that petitioners failed to report income from their misuse of BOH and APAG funds from 1994 to 1998, and accordingly, a deficiency exists for

[*30] each of the years at issue. Petitioners argue that the amounts received from BOH and APAG were loans to petitioner and therefore were properly excluded from income. Petitioners alternatively argue that if we find that the amounts received from BOH and APAG were income, they had sufficient NOL carryover deductions to offset any income and therefore no deficiency exists for any of the years at issue. We agree with respondent that the funds petitioners took from BOH and APAG were income during the years at issue and further that petitioners are not entitled to the claimed NOL carryover deductions.

A.  Whether Amounts Received Were Income, Loans, or Business Expenses

There are two components to petitioners' unreported income: (1) income disguised as loans, and (2) income classified as business expenses related to purchases of personal assets and expenses for those assets. We address each component of the amounts taken from BOH and APAG.

1.  Amounts Disguised as Loans

Respondent has established by clear and convincing evidence that the amounts taken by petitioners from BOH and APAG were income rather than loans. Petitioners never drew salaries from BOH or APAG and were heavily indebted to creditors during the years at issue. However, they maintained a lavish lifestyle

[*31] through liberal use of BOH and APAG funds. Their explanation that the amounts taken from BOH and APAG were loans and not income is not credible in light of the evidence respondent has presented to the contrary.

First, petitioner's 1994 fee agreement was executed with Mr. Baker personally, rather than with BOH or APAG. It is unreasonable to believe that petitioner, a longtime businessman, would think that his personal agreement with Mr. Baker could serve as an excuse to drain money from BOH and APAG. Additionally, the lawsuit that underpinned the 1994 fee agreement ended in 1994 in favor of GMC and GMAC. Thus, the 1994 fee agreement is not a plausible explanation for petitioners' siphoning of money from BOH and APAG from 1994 to 1998.

Second, petitioners cannot transmute the nature of the amounts taken from income to loans merely by calling them so via notations in BOH's general ledger and the signing of a promissory note. Whether a bona fide debtor-creditor relationship exists is a question of fact to be determined upon a consideration of all the pertinent facts. See Haber v. Commissioner, 52 T.C. 255, 266 (1969), aff'd, 422 F.2d 198 (5th Cir.1970). The most important elements of this determination are a good-faith intent on the part of the debtor to repay the loan and a good-faith intent of the creditor to enforce repayment. Fisher v. Commissioner,

[*32] 54 T.C. 905, 909-910 (1970). Courts examine various factors to determine whether the parties had the requisite good-faith intent, including whether the following elements existed: (1) a written loan agreement, (2) a fixed schedule for repayment, (3) any request for security or collateral, (4) interest charged on the loan, (5) a demand for repayment, (6) a memorialization of the loan in the parties' books, (7) any repayments actually made, and (8) the borrower's solvency at the time of the loan. See, e.g., Rickard v. Commissioner, T.C. Memo. 2010-159.

These factors weigh heavily against petitioners' argument that there were bona fide loans between them and BOH and APAG. In contrast, they bolster respondent's evidence that the funds taken from BOH and APAG were income to petitioners. There was no written loan agreement, only a promissory note signed by petitioner that was never shown to Mr. Baker or any other corporate officers at BOH. There was no fixed schedule for repayment, nor were there demands for repayment or any repayments actually made, in large part because petitioner executed the promissory note in secrecy. Petitioners did not offer any security or collateral and did not pay any interest on the loan. Further, petitioners were insolvent because of the judgments against them relating to their earlier theft from Messrs. Palmer and McCormack. Moreover, neither Mr. Baker nor any other representative of BOH or APAG authorized petitioners to "lend" themselves vast

[*33] sums of company money. We find that petitioners did not have a good-faith intent to repay the amounts taken and there was no genuine debtor-creditor relationship.

Third, petitioners argue that petitioner discussed with his C.P.A., Charles Roach, whether to treat the funds received from BOH and APAG as income or loans. Petitioners contend that they concluded that even if the "loans" were income, they would not be liable for any income tax because they had NOL carryover deductions sufficient to offset any such income. Mr. Roach did not testify, and we are left with only petitioner's unsubstantiated testimony regarding discussions he may have had about the tax treatment of the amounts received from BOH and APAG. Petitioner's description of his discussions with Mr. Roach bolsters our conclusion that the amounts received were never bona fide loans. For the foregoing reasons, we find that the amounts received were not loans because they were not received under the 1994 fee agreement and petitioners never had a good-faith intent to repay any amounts received from BOH and APAG.

2. Amounts Disguised as Business Expenses

Respondent has also proven by clear and convincing evidence that the amounts disguised as business expenses were in fact income to petitioners. Most of the so-called business expenses had no relationship to BOH's and APAG's

[*34] intended purpose of creating a publicly traded auto mall. Instead, they inured solely to the benefit of petitioners and their children. Petitioners' arguments that the expenses associated with various automobiles and real estate were in fact business expenses of BOH and APAG are not credible. For example, petitioners argue that "certain parcels of real estate" were purchased for "investment" or "corporate use". However, all of the farms purchased and titled in BOH's and APAG's names were used exclusively by petitioners and their children and had no function other than entertainment for the O'Neal family. Furthermore, the personal residences in Florida and the condominium in Indiana inured exclusively to the benefit of petitioners; except for some BOH and APAG business petitioner performed at 8484 Bay Hill Boulevard, BOH and APAG employees never used these premises for BOH or APAG business. Additionally, SA Waldon reduced the amounts attributable to automobile purchases because some automobiles had a legitimate business purpose; the remaining automobiles were used exclusively for the benefit of petitioners and their children.

Petitioners attempt to sidestep the characterization of the amounts disguised as business expenses by pointing out that the real estate and automobiles were titled in BOH's and APAG's names. It is well established that tax consequences are determined by substance and not mere form. See, e.g., Frank Lyon Co. v.

[*35] United States, 435 U.S. 561, 573 (1978) ("The [Supreme] Court has never regarded 'the simple expedient of drawing up papers[]' * * * as controlling for tax purposes when the objective economic realities are to the contrary." (quoting Commissioner v. Tower, 327 U.S. 280, 291 (1946))). Command over property or enjoyment of its economic benefits identifies the real owner for Federal income tax purposes. Anderson v. Commissioner, 164 F.2d 870, 873 (7th Cir. 1947), aff'g 5 T.C. 443 (1945). Petitioners were the beneficial owners of various properties titled in BOH's and APAG's names. Additionally, they benefitted by paying expenses related to those properties from BOH's and APAG's accounts and disguising the costs as business expenses. Accordingly, respondent has proven by clear and convincing evidence that these amounts are income to petitioners rather than business expenses of BOH and APAG.

### 3. Conclusion as to Amounts Includible in Income

Although not conclusive as to the precise understatement amount, a taxpayer's admission in a plea agreement from a prior criminal proceeding as to the precise amount by which he understated net income constitutes strong evidence of the understatement amount. See Ephrem v. Commissioner, T.C. Memo. 2014-12. Further, petitioner's conviction pursuant to section 7206(1) for tax years 1997 and 1998 estops him from contesting that an underpayment exists

**[\*36]** for those tax years. <u>See, e.g.</u>, <u>Considine v. United States</u>, 683 F.2d 1285, 1287 (9th Cir. 1982); <u>Wright v. Commissioner</u>, 84 T.C. at 643-644; <u>Reinhard v. Commissioner</u>, T.C. Memo. 2015-116. Petitioner admitted in his plea agreement to receiving income in the amounts identified as having been disguised as loans or business expenses. Petitioners offer no credible basis for reducing these amounts. Consequently, petitioners received unreported taxable income of $286,091, $924,603, $964,326, $3,019,208, and $1,376,697 in 1994, 1995, 1996, 1997, and 1998, respectively.

### B.  Entitlement to NOL Carryforward Deductions

Respondent has proven by clear and convincing evidence that petitioners received unreported income during each of the years at issue. However, petitioners argue that in the event we find the amounts received from BOH and APAG were income, they nevertheless do not owe any additional Federal income tax because they have sufficient NOL carryover deductions to offset the receipt of any income.

#### 1.  Generally Applicable S Corporation Basis Rules

Generally, the term "net operating loss" is defined in section 172(c) to mean the excess of allowable deductions over gross income. Taxpayers are entitled to an NOL deduction for the aggregate of NOL carrybacks and carryovers to the

**[\*37]** taxable year. Sec. 172(a). For taxable years beginning after August 5, 1997, the period for an NOL carryback is 2 years and the period for an NOL carryover is 20 years. Sec. 172(b)(1)(A). For taxable years beginning on or before August 5, 1997, the period for an NOL carryback is 3 years and the period for an NOL carryover is 15 years. Taxpayer Relief Act of 1997, Pub. L. No. 105-34, sec. 1082(a), 111 Stat. at 950.

A shareholder of an S corporation can directly deduct his or her share of entity-level losses in accordance with the flowthrough rules of subchapter S. See sec. 1366(a). The losses cannot exceed the sum of the shareholder's adjusted basis in his or her stock and the shareholder's adjusted basis in any indebtedness of the S corporation to the shareholder. Sec. 1366(d)(1)(A) and (B). The disallowed losses may be carried forward indefinitely and claimed when and to the extent that the shareholder increases his or her basis in the S corporation. See sec. 1366(d)(2). Additionally, the basis of a shareholder's stock in an S corporation is reduced by nontaxable distributions by the corporation. Sec. 1367(a)(2)(A). Thus, petitioner could have claimed losses from the Arnold Palmer dealerships only to the extent he had sufficient stock basis in the corporations or basis in any indebtedness of the corporations.

**[\*38]** What constitutes "adjusted basis of any indebtedness of the S corporation to the shareholder" under section 1366(d)(1)(B) is a question that has been considered numerous times by this and other courts. Generally, mere shareholder guaranties of S corporation indebtedness fail to satisfy the requirements of section 1366(d)(1)(B). Spencer v. Commissioner, 110 T.C. 62, 83 (1998); Estate of Leavitt v. Commissioner, 90 T.C. 206, 211 (1988), aff'd, 875 F.2d 420, 422 (4th Cir. 1989); Raynor v. Commissioner, 50 T.C. 762, 770-771 (1968). In Raynor v. Commissioner, 50 T.C. at 770-771, we held that indirect borrowing does not give rise to indebtedness from the corporation to the shareholder until and unless the shareholder pays part or all of the obligation. Until the shareholder actually pays the obligation, "'liability' may exist, but not debt to the shareholders." Id. at 771; see also Brown v. Commissioner, T.C. Memo. 1981-608, 42 T.C.M. (CCH) 1460, 1464 (1981) ("Not until the guarantor pays on the obligation does the guarantor make an actual investment."), aff'd, 706 F.2d 755 (6th Cir.1983). Further, for a loan to create basis, the taxpayer must make an economic outlay, which is accomplished when the taxpayer incurs a cost on a third-party loan or is left poorer in a material sense after the transaction. Maloof v. Commissioner, T.C. Memo. 2005-75, aff'd, 456 F.3d 645 (6th Cir. 2006).

**[\*39]** However, the Court of Appeals for the Eleventh Circuit, to which an appeal in this case would lie, has held that a shareholder who has guaranteed a loan to an S corporation may increase his basis where, in substance, the shareholder has borrowed funds and subsequently advanced them to the corporation. Selfe v. United States, 778 F.2d 769, 773 (11th Cir. 1985). The Court of Appeals partially agreed with the reasoning of the Court of Appeals for the Sixth Circuit in Brown v. Commissioner, 706 F.2d 755 (6th Cir. 1983), that an economic outlay is required before a shareholder may increase his basis in an S corporation; however, the Court of Appeals in Selfe disagreed that a shareholder must, in all cases, make payments on a loan before increasing his basis as a result of guaranteeing the loan to the corporation. Relying on Plantation Patterns, Inc. v. Commissioner, 462 F.2d 712 (5th Cir. 1972),[5] the court in Selfe held that a shareholder guaranty of a loan may be treated, for tax purposes, as an equity investment in the corporation where the lender looks to the shareholder as the primary obligor. Selfe, 778 F.2d at 774. The court in Selfe also noted that the analysis in Plantation Patterns focused on

---

[5]The U.S. Court of Appeals for the Eleventh Circuit was established on October 1, 1981, pursuant to the Fifth Circuit Court of Appeals Reorganization Act of 1980, Pub. L. No. 96-452, 94 Stat. 1994. In Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981), that court adopted the decisions of the U.S. Court of Appeals for the Fifth Circuit handed down before close of business on September 30, 1981, as governing law in the Eleventh Circuit.

**[\*40]** "highly complex issues of fact" and that consideration of similar inquiries must be "carefully evaluated on their own facts". Id.

> 2.      Petitioner's Bases in the Arnold Palmer Dealerships

Petitioners' brief does not identify the exact amount of NOLs claimed, but the Court assumes that, pursuant to petitioners' 1994-98 tax returns, the claimed NOLs exceed $6 million.[6] The claimed NOL carryover deductions relate to losses originally reported on petitioners' 1988, 1989, and 1990 Federal income tax returns. The claimed NOLs are purportedly attributable to flowthrough losses from the Arnold Palmer dealerships and totaled $6,111,355 for tax years 1988, 1989, and 1990.

The record contains no evidence reliably establishing petitioners' bases, if any, in the Arnold Palmer dealerships or their entitlement to NOLs arising

---

[6]Petitioners contend that equitable estoppel precludes respondent from challenging their claim to NOLs arising in 1988, 1989, and 1990 since those losses were not questioned by the Internal Revenue Service before this case. Petitioners' argument ignores that "[i]t is well settled that we may determine the correct amount of taxable income or net operating loss for a year not in issue (whether or not the assessment of a deficiency for that year is barred) as a preliminary step in determining the correct amount of a net operating loss carryover to a taxable year in issue." Lone Manor Farms, Inc. v. Commissioner, 61 T.C. 436, 440 (1974), aff'd without published opinion, 510 F.2d 970 (3d Cir. 1975). Additionally, each tax year stands on its own, and the Commissioner may challenge in a succeeding year what was condoned or agreed to for a prior year. See Rose v. Commissioner, 55 T.C. 28, 31-32 (1972).

[*41] therefrom. Petitioners have not provided any Forms 1120S, U.S. Income Tax Return for an S Corporation, or Forms 1065, Schedule K-1, Partner's Share of Income, Deductions, Credits, etc., for any of the Arnold Palmer dealerships in which petitioner was a one-third shareholder. They contend that he contributed "significant funds" to the dealerships but do not identify any specific dollar amounts contributed. In contrast, the record reflects that petitioners misappropriated amounts in excess of $6 million from the Arnold Palmer dealerships during the late 1980s which they did not report on their 1988 or 1989 income tax return. Furthermore, the NOLs reported on the 1988, 1989, and 1990 tax returns are factually inconsistent with each other and do not support a finding that petitioners are entitled to the claimed amounts. The 1989 and 1990 tax returns report larger carryover amounts than what was reported on the 1988 and 1989 returns, respectively, and petitioners have not offered any explanation to address these inconsistencies.

In addition to the fact that petitioners siphoned money from the dealerships rather than contributing capital, petitioner's signing of the July 1990 promissory note does not constitute indebtedness from the corporations to him within the meaning of section 1366(d)(1)(B). Petitioners have presented no information that Ford Motor Credit looked to petitioner as the primary obligor on the note, as

[*42] would be required under Selfe.  Instead, testimony from Mr. Blackburn indicates that Messrs. Palmer and McCormack were the primary obligors on the note.  In  sum, petitioner did not make any economic outlay on the July 1990 promissory note, nor was he left poorer in a material sense, as Messrs. Palmer and McCormack ultimately repaid the loan.  Likewise, there is no evidence to indicate that petitioner made any economic outlay when he signed the August 1992 promissory note.

Even in criminal cases, where the Government bears the burden of proof beyond a reasonable doubt, proof of unreported income is sufficient to establish an underpayment of tax absent proof by the taxpayer of offsetting expenses.  Monroy v. Commissioner, T.C. Memo. 1996-540 (citing United States v. Hiett, 581 F.2d 1199, 1202 (5th Cir. 1978), Elwert v. United States, 231 F.2d 928, 933-936 (9th Cir. 1956), and United States v. Bender, 218 F.2d 869, 871 (7th Cir. 1955)).  Petitioners have introduced no evidence, other than their uncorroborated testimony, that would bolster their unsubstantiated claim that they had any bases in the dealerships, and we find that petitioners (1) lacked bases in the dealerships, (2) were not entitled to NOLs for 1988-90, and therefore (3) do not have NOL carryovers that would offset the unreported income from the years in issue.  See, e.g., Gould v. Commissioner, 139 T.C. 418 (finding that the Commissioner's

[*43] burden as to fraud was met where the taxpayers failed to introduce evidence establishing the existence or amount of claimed NOLs); Brooks v. Commissioner, 82 T.C. 413, 433-434 (1984) ("Notwithstanding respondent's burden of proof as to fraud, there comes a time when petitioner must come forward with evidence in support of his claimed defenses[.] * * * Petitioner's failure * * * to explain the incriminating evidence by coming forward with other evidence in support of his contentions justifies the inference that such evidence does not exist or would be unfavorable to him." (citations omitted)), aff'd without published opinion, 772 F.2d 910 (9th Cir. 1985); Green v. Commissioner, T.C. Memo. 2010-109, 99 T.C.M. (CCH) 1444, 1449 (2010) ("Respondent has also shown that petitioners claimed deductions for * * * NOL carryforwards * * * to which they were not entitled and which resulted in underpayments of tax.").

Respondent has demonstrated through clear and convincing evidence that petitioners were not entitled to the NOL deductions they claimed on their 1988-90 tax returns, and petitioners do not therefore have NOL carryovers from those years to offset the unreported income during the years at issue. Accordingly, respondent has met his burden of proof to show that there is an underpayment for each of the tax years at issue.

**[*44]** Respondent makes two arguments as to why petitioners are not entitled to the claimed NOL deductions. First, respondent argues that petitioners lacked bases in the Arnold Palmer dealerships sufficient to allow them to use any losses flowing therefrom, as discussed above. Second, respondent argues that petitioners had unreported income for 1988 and 1989 that reduces their claimed NOL deductions accordingly. We need not and do not decide respondent's alternative argument regarding petitioners' unreported income for tax years 1988 and 1989.

### C. Conclusion as to Deficiencies for 1994-98

Because we find that petitioners received income from BOH and APAG during the years at issue in the form of amounts disguised as loans and business expenses and they are not entitled to NOL carryover deductions from tax years 1988-90, we further find that there was a deficiency in petitioners' income tax for each year at issue. Consequently, respondent has also satisfied the first prong of section 6663 by proving that an underpayment exists for each year at issue.

### III. Fraudulent Intent

If any part of any underpayment of tax required to be shown on a return is attributable to fraud, section 6663(a) imposes a penalty equal to 75% of the portion of the underpayment which is attributable to fraud. Section 6663(b) provides that once the Commissioner establishes that any portion of the

**[\*45]** underpayment is due to fraud, the entire underpayment is to be treated as attributable to fraud except with respect to any portion that the taxpayer establishes, by a preponderance of the evidence, is not attributable to fraud. The entire taxable year remains open under section 6501(c)(1) even if only a part of the underpayment for a year is attributable to fraud. Lowy v. Commissioner, 288 F.2d 517, 520 (2d Cir. 1961), aff'g T.C. Memo. 1960-32. "Thus, where fraud is alleged and proven, respondent is free to determine a deficiency with respect to all items for the particular taxable year without regard to the period of limitations." Colestock v. Commissioner, 102 T.C. 380, 385 (1994).

Once an underpayment has been proven, the second prong of the fraud test requires the Commissioner to prove that, for each year at issue, at least some portion of the underpayment is due to fraud, defined as an intentional wrongdoing designed to evade tax believed to be owing. DiLeo v. Commissioner, 96 T.C. at 874. The Court may examine the taxpayer's whole course of conduct to determine whether fraud exists. Stone v. Commissioner, 56 T.C. 213, 224 (1971). The existence of fraud is a question of fact to be resolved from the entire record. Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), aff'd without published opinion, 578 F.2d 1383 (8th Cir. 1978). Fraud is never imputed or presumed, and therefore the Commissioner must meet his burden through affirmative evidence.

**[*46]** <u>See</u> <u>Niedringhaus v. Commissioner</u>, 99 T.C. 202, 210 (1992); <u>Petzoldt v. Commissioner</u>, 92 T.C. 661, 699 (1989); <u>Beaver v. Commissioner</u>, 55 T.C. 85, 92 (1970). Fraud may be proved by circumstantial evidence and reasonable inferences drawn from the facts because direct proof of a taxpayer's intent is rarely available. <u>Toushin v. Commissioner</u>, 223 F.3d 642, 647 (7th Cir. 2000), <u>aff'g</u> T.C. Memo. 1999-171; <u>Petzoldt v. Commissioner</u>, 92 T.C. at 699. Fraud is not imputed from one spouse to another. <u>Stone v. Commissioner</u>, 56 T.C. at 227-228. In the case of a joint return, the section 6663 penalty does not apply with respect to a spouse unless some part of the underpayment is due to the fraud of such spouse. Sec. 6663(c).

A. <u>Determination of Fraudulent Intent for 1994-98</u>

Over the years, courts have developed a nonexclusive list of factors that demonstrate fraudulent intent. These badges of fraud include: (1) understatement of income, (2) inadequate maintenance of records, (3) implausible or inconsistent explanations of behavior, (4) concealment of assets or income, (5) failure to cooperate with tax authorities, (6) engaging in illegal activities, (7) an intent to mislead which may be inferred from a pattern of conduct, (8) lack of credibility of the taxpayer's testimony, (9) failure to file tax returns, (10) filing false documents, (11) failure to make estimated tax payments, and (12) dealing in cash. <u>See</u> <u>Spies</u>

[*47] v. United States, 317 U.S. 492, 499 (1943); Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), aff'g T.C. Memo. 1984-601; Niedringhaus v. Commissioner, 99 T.C. at 211.  A taxpayer's intelligence, education, and tax expertise are relevant for purposes of determining fraudulent intent.  See Stephenson v. Commissioner, 79 T.C. 995, 1006 (1982), aff'd, 748 F.2d 331 (6th Cir. 1984); Iley v. Commissioner, 19 T.C. 631, 635 (1952).  We consider several of these factors in turn.

### 1.    Understatement of Income

Petitioners consistently understated their income by large amounts for the years at issue.  During the years at issue, petitioners never reported any income from either BOH or APAG, despite receiving millions from company coffers.  Petitioners' omitted income dwarfs the income they did report from Mrs. O'Neal's nursing job.  For example, for 1997 they reported income from Mrs. O'Neal's nursing job of $2,868, which is less than 0.1% of the $3,019,208 they received that year.  Consistent and substantial underreporting of income is strong evidence of fraud, particularly if there are other circumstances showing an intent to conceal income.  See Parks v. Commissioner, 94 T.C. at 664 ("A pattern of consistent underreporting of income, especially when accompanied by other circumstances showing an intent to conceal, justifies the inference of fraud."); Abdallah v.

[*48] Commissioner, T.C. Memo. 2013-279 (finding fraud where taxpayers reported between 6% and 19% of their actual income over the course of five years of reporting); Branson v. Commissioner, T.C. Memo. 2012-124, 103 T.C.M. (CCH) 1680, 1686 (2012) ("A pattern of substantially underreporting income for several years is strong evidence of fraud, particularly if the reason for the understatements is not satisfactorily explained or due to innocent mistake."). Accordingly, this factor favors a finding of fraud by both petitioners from 1994 through 1998.

### 2. Inadequate Maintenance of Records

Petitioner maintained some records pertaining to his misuse of BOH and APAG money. Specifically, he documented in BOH's general ledger the "loans" which were actually disguised income and signed the October 1995 promissory note to reflect amounts taken from BOH. However, given that these records were themselves fraudulent in that petitioner created them in order to mask his theft from BOH and APAG, we are disinclined to credit petitioners for this factor. Accordingly, this factor is neutral with respect to both petitioners for all tax years at issue.

**[*49]**    3.    <u>Implausible or Inconsistent Explanations of Behavior</u>

Petitioner offered various implausible and inconsistent explanations for the understated income.  First, he claimed that he took money from BOH and APAG under the 1994 fee agreement with Mr. Baker even though the 1994 fee agreement did not extend to BOH and APAG and the lawsuit underpinning the 1994 fee agreement concluded in 1994.  Despite these facts, petitioner has attempted to use the 1994 fee agreement as an excuse for taking money from BOH and APAG from 1994 through 1998.  Second, petitioner claimed that the misappropriated funds were loans from the companies to him, a claim which, as we discussed earlier, is simply not credible.  Separately, petitioner has claimed that he and his accountant discussed whether to treat the transfers from BOH and APAG as loans or as income on petitioners' tax returns.  These explanations are inconsistent with one another and implausible.  This factor favors a finding of fraud against petitioner for all tax years at issue.

Mrs. O'Neal's position throughout this case has been that she never questioned why she and her children were allowed access to BOH and APAG funds, she never questioned her husband's finances, and she did not give more than a cursory glance to their tax returns during the years at issue.  She also testified that it was her habit to provide receipts for various expenses, and she

[*50] "never got involved with * * * [petitioner's] business". However, she knew that the amounts she was receiving from BOH and APAG were for personal expenses, and she was aware that she and petitioner did not title assets in their names to avoid creditors who had judgments in excess of $18 million against them.

It would defy common sense to believe that Mrs. O'Neal never questioned the source of funds for the family's personal expenses during the years at issue, particularly in light of the fallout from petitioner's business dealings with Messrs. Palmer and McCormack. Mrs. O'Neal was aware of the judgments against them from various creditors; those judgments arose out of the same pattern of corporate theft that petitioners perpetrated during the years at issue. Further, Mrs. O'Neal was aware of the significant dollar amounts attached to those judgments and yet supposedly did not question the lavish lifestyle she and petitioner continued to enjoy during the years at issue, even though she had to return to work in 1992 to support the family after petitioner was fired from the Arnold Palmer dealerships. She also clearly had some misgivings over receiving large amounts of corporate funds from BOH, such as when she returned a $50,000 check written on BOH's bank account to her husband. Even if we were to take Mrs. O'Neal at her word, "willful blindness" is an indicator of fraud if the taxpayer is aware of a high

[*51] probability of unreported income and deliberately avoids steps to confirm this awareness.  Fiore v. Commissioner, T.C. Memo. 2013-21.  On balance, this factor favors a finding of fraud against Mrs. O'Neal for all tax years at issue.

### 4.     Concealment of Assets or Income

Petitioners consistently concealed assets or income over the course of the years at issue.  Not only did they freely spend BOH and APAG money on personal expenses; they titled various properties--including six farms, three properties or parcels on Bay Hill Boulevard in Orlando, Florida, two properties in Carmel, Indiana, and several automobiles--in others' names.  These properties were used solely for petitioners' personal benefit and did not serve any business purpose for BOH or APAG.  Petitioners also opened bank accounts in their children's names into which they deposited BOH and APAG funds.

Petitioner also pleaded guilty to two counts of filing a false tax return in violation of section 7206(1) for tax years 1997 and 1998.  Although his guilty plea does not collaterally estop petitioner from denying that he fraudulently understated petitioners' income, it is a probative fact which may be considered persuasive evidence of fraudulent intent.  See Wright v. Commissioner, 84 T.C. at 643-644.  Upon entering his guilty plea, petitioner acknowledged that he was guilty of signing materially false tax returns for tax years 1997 and 1998 and that he

[*52] underreported income in each tax year at issue. This factor favors a finding of fraud against both petitioners for all tax years at issue.

### 5.     Failure To Cooperate With Tax Authorities

Petitioner cooperated with SA Waldon's investigation only after another target of the investigation began cooperating. This factor is therefore neutral with respect to petitioner. There is no information in the record pertaining to Mrs. O'Neal's cooperation, or lack thereof, with the Government, and this factor is therefore absent with respect to Mrs. O'Neal.

### 6.     Pattern of Conduct Showing an Intent To Mislead

Petitioners engaged in a pattern of conduct that indicates an intent to mislead. They consistently disguised personal expenses as business expenses and titled assets in the names of their children and BOH and APAG. Petitioner signed the October 1995 promissory note, reflecting totals taken from BOH from 1994 to 1997 but never showed it to Mr. Baker or any other officers within the company. This factor favors a finding of fraud against both petitioners for all tax years at issue.

### 7.     Lack of Credibility of Petitioners' Testimony

A taxpayer's lack of credibility, "the inconsistencies in his testimony and his evasiveness on the stand[,] are heavily weighted factors in considering the

[*53] fraud issue." <u>Toussaint v. Commissioner</u>, 743 F.2d 309, 312 (5th Cir. 1984), <u>aff'g</u> T.C. Memo. 1984-25; <u>DeVries v. Commissioner</u>, T.C. Memo. 2011-185. We find that petitioners' respective testimonies are not credible. Petitioners have a history of theft from the companies with which petitioner has been affiliated. They knew third parties had judgments against them in excess of $18 million as a result of petitioner's earlier theft from the Arnold Palmer dealerships. It strains credibility that Mrs. O'Neal "never questioned" petitioner regarding the source of the funding for their lifestyle during the years at issue when she was aware of the judgments against them and knew that they were avoiding titling assets in their names in order to avoid their creditors.

Petitioner's explanations for many of his actions are not credible. First, he knew the lawsuit against GMC and GMAC ended in 1994 but claims that the 1994 fee agreement rationalized his taking of funds from BOH and APAG from 1994 until his dismissal from the companies in 1998. Second, he claims that the six farms he purchased with BOH and APAG money were intended to be corporate retreats despite his never telling anyone affiliated with either company about their existence. Similarly, he disguised the Carmel, Indiana, condominium as a "corporate condo" even though he and his family had exclusive use of it and nobody at BOH or APAG was aware of its existence. Third, petitioner's

[*54] statements that the amounts he took from the companies were loans is not credible because (1) no bona fide loan agreements existed between petitioner and BOH or APAG, (2) he lacked the ability to repay any loans because of the $18 million judgments against him and his wife, and (3) any characterization of the income as "loans" runs counter to his other claim that the funds were taken under the 1994 fee agreement. This factor favors a finding of fraud against both petitioners for all tax years at issue.

### 8. Filing False Documents

Filing false documents includes filing false income tax returns. Worth v. Commissioner, T.C. Memo. 2014-232; Potter v. Commissioner, T.C. Memo. 2014-18; Morse v. Commissioner, T.C. Memo. 2003-332, aff'd, 419 F.3d 829 (8th Cir. 2005). Petitioners filed false documents for each year at issue in which they significantly underreported their income by not reporting any of the amounts taken from BOH and APAG. Mrs. O'Neal claims that she never reviewed the tax returns but simply "showed up" to sign them. Regardless of her level of review, she signed the returns under penalty of perjury; she cannot abdicate the responsibility to file a correct tax return by failing to review it in its entirety. Moreover, a reasonable person reviewing petitioners' joint returns for the years at issue would have questioned the lack of reported income in comparison to petitioners' lavish

[*55] lifestyle. This factor favors a finding of fraud for both petitioners for all tax years at issue.

### 9. Failure To Make Estimated Tax Payments

Petitioners failed to make any estimated tax payments during the years at issue. Section 6654(d)(1)(A) requires quarterly installment payments of 25% of the required annual payment. The required annual payment is the lesser of 90% of the tax due for the year or 100% of the tax shown on the preceding year's return. Sec. 6654(d)(1)(B). This factor favors a finding of fraud against both petitioners for all tax years at issue.

### B. Conclusion as To Petitioners' Fraud

Seven badges of fraud are present in this case for both petitioners for all tax years at issue. After considering the entire record and the factors discussed supra, we find that for 1994-98 respondent has provided clear and convincing evidence that petitioners intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. See Sadler v. Commissioner, 113 T.C. at 102; Parks v. Commissioner, 94 T.C. at 660-661. Accordingly, respondent has met his burden of proof, and petitioners are liable for the section 6663 civil fraud penalty for each year at issue. Consequently, the entire amount of the underpayment for each taxable year at issue is attributable to

[*56] fraud.  Petitioners have not shown that any portion of the underpayment for each year at issue is not due to fraud.  See sec. 6663(b).

IV.    Section 6651(a)(1) Addition to Tax

Normally, the Commissioner bears the burden of production with respect to any penalty or addition to tax.  Sec. 7491(c); Higbee v. Commissioner, 116 T.C. 438, 446 (2001).  In this case, it is unclear whether respondent bears any burden of production under section 7491(c) because it is not clear whether the examination commenced after July 22, 1998, the effective date of section 7491.  However, respondent has met any burden of production that he may have.  To meet that burden, the Commissioner must come forward with sufficient evidence indicating that it is appropriate to impose the relevant penalty.  Higbee v. Commissioner, 116 T.C. at 446.  However, once the Commissioner has met the burden of production, the taxpayer bears the burden of proving that the penalty is inappropriate.  See Rule 142(a); Higbee v. Commissioner, 116 T.C. at 446-449.

Section 6651(a)(1) provides for an addition to tax for failure to timely file a return unless it is shown that such failure is due to reasonable cause and not due to willful neglect.  See United States v. Boyle, 469 U.S. 241, 245 (1985).  Petitioners filed their 1998 tax return late on August 1, 2001, and respondent has therefore met his burden of production.  Petitioners did not address the section 6651(a)(1)

**[\*57]** addition to tax in their brief and have offered no reasonable cause for their failure to timely file their 1998 tax return. Accordingly, petitioners are liable for the section 6651(a)(1) addition to tax for tax year 1998.

In reaching our holdings, we have considered all arguments made. To the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.