# United States Tax Court

T.C. Memo. 2025-133

CARL B. BARNEY,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

———————

Docket No. 5310-22.                    Filed December 30, 2025.

———————

*Michael D. Black* and *April M. Medley*, for petitioner.

*David Weiner*, *Nicholas D. Doukas*, *Eugene A. Kornel*, *Victor W. Zhao*, and *Justyna W. Jozwik*, for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

WEILER, *Judge*: This case arises from a Notice of Deficiency dated December 20, 2021, in which the Internal Revenue Service (IRS or respondent) determined a deficiency in Carl B. Barney's 2012 federal income tax of $31,180,039 and an accuracy-related penalty under section 6662(h)[1] of $12,472,016.

In his Petition Mr. Barney not only disputed the deficiency and the penalty determined by the IRS, but he also further claimed he paid excess tax in tax year 2012 and seeks a refund of $24,983,256.

———————

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C. or Code), in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are rounded to the nearest dollar.

**[\*2]**   The issues remaining for determination for tax year 2012 are (1) whether Mr. Barney has a tax deficiency due or made an overpayment; (2) whether Mr. Barney is entitled to a noncash charitable contribution deduction of $132,428,708 resulting from a bargain sale to a charity; and (3) whether Mr. Barney is subject to a penalty under section 6662.

FINDINGS OF FACT

This case was tried during a special trial session of this Court in Los Angeles, California. Some of the facts are stipulated and are so found. The Stipulations of Facts and the attached Exhibits are incorporated herein by this reference.

I.   *Mr. Barney and His S Corporations*

Mr. Barney began to acquire for-profit colleges in 1985. By 2012 Mr. Barney owned five S corporations relevant to this case: Stevens-Henager College, Inc. (SHC), CollegeAmerica Arizona, Inc. (CAAI), CollegeAmerica Services, Inc. (CASI), California College, Inc. (CCI), and CollegeAmerica Denver, Inc. (CADI) (collectively, S Corporations). SHC and CCI were incorporated in Utah. CAAI and CADI were incorporated in Colorado. CASI was incorporated in Nevada. The S Corporations operated postsecondary educational institutions in Utah, Idaho, Colorado, Wyoming, Arizona, and California (collectively, Colleges). The dispute here arises from the bargain sale and donations of these five S Corporations to the Center for Excellence in Higher Education (CEHE) in 2012 (Transaction).

Sometime in 2009 Mr. Barney sought to sell the Colleges. As part of his due diligence and in connection with this attempted sale of the Colleges, he retained Goldman Sachs. Although Mr. Barney received an offer for the Colleges, he did not complete the sale because of financial market conditions resulting from the Great Recession.[2] Subsequently Mr. Barney learned that other for-profit colleges owners were converting to nonprofit entities.

Mr. Barney owned each of the S Corporations through the Carl Barney Living Trust (CBLT). CBLT is a revocable trust organized under California law and is treated as a disregarded entity for federal income

---

[2] The period of worldwide economic downturn occurring from 2007 until 2009, generally known as the Great Recession, marks the most significant U.S. economic recession in recent times.

[*3] tax purposes. While the S Corporations were held within CBLT, Mr. Barney was—and remains—the sole trustee and beneficiary of CBLT. Consequently, for federal income tax purposes, Mr. Barney was the owner of the S Corporations, and all their profits and losses passed through to him. In 2012 Mr. Barney was the chairman of each S Corporation. He had previously been the chief executive officer (CEO) of each S Corporation; however, in May 2010 he hired Eric Juhlin to be the CEO of each S Corporation. Mr. Juhlin took over the day-to-day managerial duties and was the CEO of the S Corporations at the time of the Transaction. Before and on December 31, 2012, each of the Colleges was licensed as an educational organization in the state(s) in which it was doing business and accredited by the Accrediting Commission of Career Schools and Colleges.

Before the Transaction Mr. Barney received profits from the S Corporations; and while he reinvested some of the profits in the Colleges, he also donated some profits to various charities. Mr. Barney was introduced to Fred Fransen, the founder and an owner of Donor Advising Research and Educational Services. In August 2011 Mr. Barney met with Dr. Fransen regarding his philanthropy goals. Dr. Fransen advised Mr. Barney on philanthropic planning and potential philanthropic endeavors, including Mr. Barney's interest in transitioning the Colleges into nonprofit entities.

II.     *The Period of Rapid Growth in For-Profit Colleges*

The S Corporations participated in federal student financial aid programs authorized under Title IV of the Higher Education Act of 1965, Pub. L. No. 89-329, 79 Stat. 1219, 1232 (codified as amended at 20 U.S.C. §§ 1070–1099d) (Title IV). Title IV authorizes the U.S. Department of Education to provide student assistance, including scholarships, grants, and reduced-interest loans to students attending eligible institutions of higher education.

From 1998 to 2005 institutions of higher education were required to conduct at least 50% of their offered courses and have at least 50% of their students on campus. However, repeal of this 50% requirement in 2005 led to a rapid expansion of online enrollment at for-profit colleges from 2006 to 2010.

As an illustration of the rapid growth in for-profit colleges, in 2007 the Colleges collectively enrolled 7,763 students while in 2010

[*4] 20,576 students were enrolled. The Colleges' tuition revenue increased from $55,451,000 in 2007 to $218,920,000 in 2010.

The Higher Education Opportunity Act, Pub. L. No. 110-315, 122 Stat. 3078 (2008), reauthorized the Higher Education Act of 1965, including Title IV funding for student assistance, and resulted in new regulations issued by the Department of Education.

III.    *The Period of Decline in For-Profit Colleges*

At the same time the Department of Education began proposing and issuing regulations regarding Title IV requirements, for-profit colleges also began experiencing increased governmental and public scrutiny. In June 2010 the U.S. Senate Health, Education, Labor, and Pension Committee (HELP Committee)—led by Senators Tom Harkin and Richard Durbin—held hearings and initiated an investigation into the for-profit college industry. The HELP Committee released a series of reports calling for policy changes regarding the oversight of for-profit colleges and questioning student outcomes at these colleges. The U.S. Government Accountability Office also conducted investigations into for-profit colleges, releasing four reports in 2010 and 2011. During this time the press commonly labeled for-profit colleges as "predators."

From 2010 to 2011 the Colleges experienced slower enrollment growth than in prior years. The number of enrolled students from 2010 to 2011 increased from 20,576 to 21,864, and in 2011 tuition revenue increased to $220,920,000. In 2011 the S Corporations derived 78% of their revenue from Title IV sources. However, in 2012 the number of enrolled students at the Colleges decreased to 19,982, and tuition revenue decreased to $198,836,000.

The wider for-profit college industry experienced a similar trend, with annual revenue growth dropping from 1.6% in 2010 to −4.9% in 2011. In 2010 the U.S. economy was beginning to rebound from the Great Recession, the unemployment rate was decreasing, and overall enrollment in for-profit colleges was decreasing as well.

IV.    *The Transaction*

Mr. Barney, who had turned 70 the year before the Transaction, wanted to retire from actively managing the Colleges. He hired Dr. Fransen to advise him on transitioning the Colleges from for-profit entities to nonprofit entities. Dr. Fransen proposed a merger between the S Corporations and CEHE, an Indiana public benefit corporation for

**[*5]** which Dr. Fransen served as executive director. CEHE was recognized by the IRS as an exempt organization under section 501(c)(3), and its mission was to "promote excellence in higher education." At the time, however, CEHE did not control or operate any higher education institutions.

In 2012 Mr. Barney through CBLT transferred for consideration three of the S Corporations—SHC, CAAI, and CASI—and donated two of the S Corporations—CCI and CADI—to CEHE.

### A.    *The Due Diligence Process*

CEHE's due diligence process before the Transaction required multiple appraisals and the production of audited financial statements. The costs of conducting the due diligence process were funded, in large part, by a contribution from Mr. Barney.

#### 1.    *The Barrington Appraisal*

As part of the Transaction the S Corporations hired Richard Pollak of Barrington Research Associates, Inc. (Barrington), to conduct an appraisal of the S Corporations. Mr. Pollak holds a bachelor's degree in finance and an MBA in finance and economics, and he has experience providing fairness opinions because of his prior employment at Duff & Phelps.[3] He is not, however, an accredited appraiser. The S Corporations provided Mr. Pollak with a valuation checklist, which included operational and compliance documentation, in-house items, and financial projections.

On October 5, 2012, Mr. Pollak first presented his findings on the value of the S Corporations as of September 30, 2012. In this presentation Mr. Pollak concluded that the S Corporations had a collective fair market value (FMV) of $650 million. Mr. Pollak later issued a report valuing the S Corporations as of December 10, 2012 (Barrington Appraisal). The Barrington Appraisal initially found an estimated FMV of $660 million for the S Corporations. However, the Barrington Appraisal concluded the FMV of the S Corporations was $620.8 million since the S Corporations held net account receivables of $39.2 million.

---

[3] Duff & Phelps is a large investment firm with some 72 offices and is currently headquartered in New York City.

[*6]  Mr. Pollak also issued individual valuation reports for each of the S Corporations, calculating the FMVs, as of December 14, 2012. In these reports Mr. Pollak determined the FMV of each S Corporation:

| S Corporation | FMV |
|---|---|
| SHC | $331,000,000 |
| CAAI | 43,000,000 |
| CASI | 135,000,000 |
| CCI | 70,000,000 |
| CADI | 81,000,000 |

In reaching his conclusions Mr. Pollak used the following methods of valuation: comparable companies analysis, comparable transaction analysis, and discounted cashflow (DCF) analysis. Mr. Pollak determined FMV on the basis of a "control value" of the S Corporations— or what the S Corporations could be sold for if a 100% equity interest were being transferred in an open-market sale.

## 2.  *The RMA Appraisal*

Additionally, the S Corporations retained Matt Connors of Rocky Mountain Advisory (RMA) to prepare an appraisal of the S Corporations. Mr. Connors received the same information from the S Corporations as Mr. Pollak received.

Mr. Connors's report dated September 12, 2013, valued the S Corporations as of November 30, 2012, at a collective FMV of $700 million (RMA Appraisal) comprising $220 million for SHC, $50 million for CAAI, $290 million for CASI, $100 million for CCI, and $40 million for CADI.

In reaching his conclusion Mr. Connors used the market approach and the income approach valuation methods. For the market approach he used the guideline public company method and the guideline merger and acquisition transaction data method. He also considered prior transactions of equity interests in the S Corporations; however, he found no such transactions existed. The income approach indicated a significantly higher FMV than the market approach, primarily because of management's financial projections and expectations that growth for the S Corporations would outpace industry averages. In reaching his final valuation Mr. Connors gave greater weight to the market

[*7] approach, and he determined FMV on the basis of a controlling, nonmarketable interest in the S Corporations.

### 3. *The Blue Report*

As part of the due diligence process CEHE engaged Blue & Co. (Blue) to review Mr. Pollak's October 5, 2012, presentation on the valuation of the S Corporations. Blue issued a summary appraisal review report (Blue Report) as of September 30, 2012, dated November 9, 2012. In reviewing Mr. Pollak's presentation, Blue found an FMV range for the S Corporations between $511.3 million and $680 million.

### 4. *Department of Education Preacquisition Review Process*

On October 2, 2012, Mr. Barney's attorney, Stanley Freeman, wrote to the Department of Education "to inquire whether the planned conversion of the Title-IV-participating institutions [the Colleges] to not-for-profit status may impact [the S Corporations'] ongoing certification to participate in the federal student aid programs." Mr. Freeman specifically informed the Department of Education that "[i]t is anticipated that, for at least the initial years after the merger is consummated, the composite score for CEHE may be below 1.0 due to the debt that will finance the merger." The letter specifically requested permission from the Department of Education to continue participating in the Title IV program "by posting a 10 percent letter of credit, coupled with the other terms specified in the provisional certification alternative set forth" in the governing regulations.

The Department of Education responded on December 20, 2012, stating that it "will review the schools' default management plans and practices to determine the adequacy of the existing plans" and advised that they may continue to participate in the Title IV programs subject to certain conditions. Mr. Juhlin concluded that on the basis of the indications that were received from the Department of Education, it was understood that "in all likelihood, we would have to post a ten-percent letter of credit at some point following the closure of the transaction."

### B. *Execution of the Merger Agreements*

During the first week of December 2012 the S Corporations' boards of directors approved the CEHE merger. On or about December 27, 2012, each S Corporation along with CEHE executed an Agreement and Plan of Merger, and Mr. Barney and CEHE executed a Conditional

[*8] Charitable Pledge Agreement (collectively, Merger Agreements). On or about December 28, 2012, Mr. Barney, on behalf of CBLT, consented to the merger. On December 28, 2012, the CEHE board of directors approved the merger. The Merger Agreements provided that CEHE would pay total consideration not to exceed $431 million for the three merging S Corporations, namely SHC, CAAI, and CASI, to the S Corporations' sole stockholder, CBLT, in the form of two promissory notes.

In response to the preacquisition review process with the Department of Education, SHC's and CAAI's Merger Agreements provided for termination of the merger after the closing if the Department of Education required a letter of credit exceeding 10% of the Title IV funds received by SHC or CAAI during the fiscal year ending December 31, 2011, or the fiscal year ending December 31, 2012. On December 31, 2012, the Transaction closed, and the S Corporations merged into CEHE.

C. *Purchase Notes and Note Purchase Agreement*

As determined under the Merger Agreements, consideration for purchase of SHC, CAAI, and CASI was paid in the form of two secured notes: Term Note A and Term Note B. Term Note A had a stated principal amount of $200 million, and Term Note B had a stated principal amount of $231 million (collectively, Purchase Notes). The Purchase Notes contained a mandatory prepayment term based on the greater of 75% of the excess cashflow or 10% of the total revenue to be paid quarterly. More specifically, the Purchase Notes contained the following provision:

> 5.1 Mandatory Prepayment. The greater of (i) 75% of the Excess Cash Flow of the Seller in each Fiscal Quarter and (ii) an amount equal to 10% of the total revenues of the Seller in each Fiscal Quarter shall be paid as a mandatory prepayment of the principal of this Note, quarterly in arrears. Each payment described in the preceding sentence shall be made no later than fifteen (15) days of the last day of a Fiscal Quarter. The Seller's obligations under this Note are not assumable, and this Note, including the outstanding principal balance plus any accrued and unpaid interest hereunder, and all other amounts payable under the Note Purchase Agreement and the other Investment Documents shall be immediately due and payable in full in

[*9]  accordance with the terms of the Note Purchase Agreement.

The Purchase Notes also contained the following provision concerning the rate of interest:

2. Interest Rate. Effective from the date hereof until such time as all principal, interest and other amounts outstanding under this Note are unconditionally and irrevocably paid and performed in full, interest shall accrue on the unpaid principal balance of this Note at a per annum rate ( calculated on the basis of a 360-day year for the number of days elapsed) equal to One percent (1 %) per annum (the "Fixed Rate"). Notwithstanding the immediately preceding sentence, if in any month in which this Note is outstanding, the Consumer Price Index for All Urban Consumers (the "CPI-U") published by the Bureau of Labor Statistics, the U.S. Department of Labor (or any successor index) increases by more than 3% as compared to the average of the CPI-U for the preceding 6 calendar months or (ii) the CPI-U for any 2 of the preceding 3 months increases by more than 3% as compared to the CPI-U for the immediately preceding calendar month, then effective on the first (1st) Business Day of the immediately following calendar month, the interest rate on this Note shall be changed to the JPMorgan Chase Bank prime rate, plus 100 basis points (the "Floating Rate"). The Floating Rate shall be determined on the first (1st) Business Day of each calendar month based on the then effective JPMorgan Chase Bank prime rate and remain in effect until the first (1st) Business Day of the immediately following calendar month.

On December 31, 2012, CBLT and CEHE executed a Note Purchase Agreement (NPA) for $431 million. The NPA equally contained a mandatory prepayment term as follows:

Section 2.5.1 Quarterly Payments. The Seller shall pay to the Buyer the greater of (i) 75% of the Excess Cash Flow of the Seller each Fiscal Quarter and (ii) an amount equal to 10% of the total revenues of the Seller in each Fiscal Quarter as a mandatory prepayment of the principal of the Notes, quarterly in arrears, as provided in the Notes.

[*10] The NPA defined CBLT's and CEHE's respective rights until CEHE fulfilled its obligations under the Purchase Notes. The NPA provided that CEHE "shall use all of the proceeds from the sale to assist in financing the transactions contemplated by the Transaction Documents." Before the Purchase Notes were paid in full, the NPA also prevented CEHE from taking certain actions without the consent of CBLT, including the sale or exchange of membership interests, the making of any further encumbrances, the making of any individual capital expenditures beyond $100,000, or the making of aggregate capital expenditures beyond a set amount for 2013, 2014, 2015, and subsequent years. On December 31, 2012, CBLT and CEHE also executed a Security Agreement making CBLT a secured lender.

## V.    *CEHE Following the Transaction*

Following the Transaction CEHE continued to operate the Colleges. Upon closing of the Transaction Mr. Juhlin became the CEO and president of CEHE, and Mr. Barney became CEHE's sole member. Mr. Barney and Mr. Juhlin became members of CEHE's board of directors, along with nine other directors. Under the terms of the Amended and Restated Bylaws of CEHE, directors may be removed or replaced only with cause. Mr. Barney was subsequently elected to serve as the chairman of the board. However, Mr. Barney received no personal benefit from CEHE, nor did he receive future profits derived from the Colleges, as he had previously received as sole shareholder of the S Corporations.

## VI.    *Redetermination of Purchase Notes*

By letter dated January 26, 2015, the Department of Education determined CEHE's composite score was 0.2 out of 3.0 which is short of the 1.5 needed to meet required financial standards. On the basis of the composite score and other additional risk factors, such as a high amount of debt on the balance sheet, CEHE would be allowed to continue to participate in the Title IV program if it provided a letter of credit of $71.6 million; this amount was equal to 50% of the Title IV funds distributed to the S Corporations in the 2014 fiscal year. The amount exceeded the 10% letter of credit that was discussed in the preacquisition review process with the Department of Education. As a result, CEHE executed Contingent Note A and Contingent Note B (collectively, Contingent Notes) to replace Term Note A and the Term Note B. Contingent Note A had a stated principal of $200 million, and Contingent Note B had a stated principal of $231 million. On March 23, 2015, CEHE and CBLT

[*11] executed a Contingent Note Agreement, which superseded the NPA. On May 22, 2015, Mr. Juhlin sent a letter via email to the Department of Education which stated that Mr. Barney, through CBLT, was "prepared to immediately forgive approximately $351,055,000 of the original debt" to ensure that CEHE achieved and maintained a composite score of 1.5.

During CEHE's board of directors meeting on November 6, 2015, Mr. Juhlin asserted that CBLT should forgive "a significant portion of CEHE's debt" in order to avoid legal action by CEHE because of disputes that had arisen and breaches of the Merger Agreements. By this date the balance on the Purchase Notes was approximately $412,555,000. At this meeting the board finalized a settlement agreement to restructure CEHE's debt to CBLT. On November 6, 2015, Mr. Barney, as trustee of CBLT, and CEHE executed a Confidential Settlement Agreement. As part of the Confidential Settlement Agreement, Contingent Note B was canceled, and CEHE was irrevocably discharged from its obligation to make further payments on Contingent Note B. Further, Contingent Note A was amended and restated, and the balance of the principal was reduced to $75 million.

VII.  *2012 Tax Returns*

  A.    *The S Corporations' 2012 Forms 1120S*

On or about September 17, 2013, each S Corporation filed its respective IRS Form 1120S, U.S. Income Tax Return for an S Corporation, for tax year 2012. Each S Corporation elected out of the installment method of reporting gain, and on the basis of the FMVs determined by Mr. Pollak in the Barrington Appraisal, the S Corporations reported capital gains from the Transaction as follows:

| S Corporation | Proceeds | Cost or Other Basis | Capital Gain |
|---|---|---|---|
| SHC | $306,047,207 | $299,870 | $305,747,337 |
| CAAI | 41,697,030 | 88,340 | 41,608,690 |
| CASI | 134,327,031 | 30,162,602 | 104,164,429 |
| CCI | 74,468,196 | 132,082 | 74,336,114 |
| CADI | 83,095,480 | 82,595 | 83,012,885 |

Each S Corporation Form 1120S included Schedule K–1, Shareholder's Share of Income, Deductions, Credits, etc., for

[*12] Mr. Barney, reporting the following charitable contribution deductions and capital gains:

| S Corporation | Charitable Contribution Deduction | Capital Gain |
|---|---|---|
| SHC | $31,492,066 | $305,747,337 |
| CAAI | 2,897,253 | 41,608,690 |
| CASI | 11,532,894 | 104,164,429 |
| CCI | 62,000,000 | 74,336,114 |
| CADI | 73,000,000 | 83,012,885 |
| **Total** | **$180,922,213** | **$608,869,455** |

Each S Corporation filed Form 8283, Noncash Charitable Contributions, and attached a copy of the Barrington Appraisal.

SHC, CAAI, and CASI each reported its merger into CEHE as a bargain sale. SHC reported $309 million as the FMV of the assets sold and $277,507,934 as the consideration received. SHC claimed $31,492,066 as a charitable deduction. CAAI reported $42 million as the FMV of the assets sold and $39,102,747 as the consideration received. CAAI deducted $2,897,253 as a charitable contribution. CASI reported $135 million as the FMV of the assets sold and $123,467,106 as the consideration received. CASI deducted $11,532,894 as a charitable contribution.

CCI reported $62 million as the FMV of the assets donated to CEHE and zero as the consideration received. CCI claimed a charitable contribution deduction of $62 million. CADI reported $73 million as the FMV of the assets donated to CEHE and zero as the consideration received. CADI deducted a $73 million charitable contribution.

B.    *Mr. Barney's 2012 Form 1040*

On or about October 31, 2013, Mr. Barney filed his Form 1040, U.S. Individual Income Tax Return, for tax year 2012, reporting the charitable contribution deductions and capital gains that flowed through the S Corporations to him. Mr. Barney also elected out of the installment method for reporting his gain from the Transaction. In total, he deducted a charitable contribution of $180,922,213 for the Transaction. However, since the deduction was limited to 30% of Mr. Barney's 2012 adjusted gross income, $441,429,027, he deducted

[*13] only $132,428,708 and reserved $48,493,505 as a carryover. Mr. Barney paid $44,616,611 in tax for tax year 2012.

By letters dated July 3, 2014, the IRS selected Mr. Barney and the S Corporations' 2012 tax returns for examination. By Letter dated November 23, 2016, the IRS sent Mr. Barney an examination report proposing a deficiency of $31,180,039 and a penalty of $10,857,411.

C.     *Amended Forms 1120S and Form 1040*

On or about September 29, 2017, each S Corporation filed its amended Form 1120S for tax year 2012.

On April 19, 2016, Mr. Barney retained Willamette Management Associates (Willamette) to analyze the financial, economic, and valuation factors of the Transaction. On September 30, 2016, Willamette submitted a report analyzing the FMVs of the Purchase Notes (Willamette Report). The Willamette Report concluded that after applying a 10% discount for lack of marketability, Term Note A had an FMV between $103 million and $105 million as of December 31, 2012. Further after applying a 20% discount for lack of marketability to Term Note B, the Willamette Report concluded that the FMV was $72 million as of December 31, 2012.

On or about September 30, 2017, Mr. Barney filed Form 1040X, Amended U.S. Individual Income Tax Return, for tax year 2012, reporting a $27,388,732 overpayment of his 2012 tax liability. Mr. Barney requested a refund of $26,888,732, and he further requested that $500,000 be applied to his estimated tax for the 2013 tax year. On or about September 30, 2017, Mr. Barney also filed Forms 1040X for the 2013, 2014, and 2015 tax years.

By Letter dated June 15, 2018, the IRS sent Mr. Barney an examination report partially disallowing his claimed refund and proposing a refund of $5,263,147. Since the IRS's proposed refund exceeded $2 million, section 6405 required that it be submitted to the Joint Committee on Taxation for review.[4]

Following this review, the IRS issued a Notice of Deficiency dated December 20, 2021. It denied Mr. Barney's claimed refund and

[4] In 2015 Mr. Barney filed a complaint in the U.S. District Court, seeking a refund for tax year 2015 of $34,771,875. The U.S. District Court has stayed that proceeding pending the outcome of this case.

**[\*14]** determined a deficiency of $31,180,039 and a penalty of $12,472,016. The Notice of Deficiency determined that Mr. Barney had failed to establish that his noncash charitable contribution satisfied the requirements of section 170 and failed to establish the FMV of the contribution. It disallowed the entirety of Mr. Barney's claimed $132,428,708 charitable contribution deduction for tax year 2012 from the Transaction and increased his taxable income by an equivalent amount. It determined an accuracy-related penalty of 40% for an underpayment of tax required to be shown on a return attributable to a gross valuation misstatement under section 6662(a), (b)(3), (e), and (h). Alternatively, the Notice of Deficiency determined a 20% accuracy-related penalty under section 6662(a) and (b)(1) and (3) attributable to a substantial valuation misstatement and/or negligence or disregard of rules or regulations. *See* I.R.C. § 6662(c), (e).

VIII. *Expert Witness Testimony Presented at Trial*

A. *Richard Pollak*

Mr. Barney offered the testimony of Richard Pollak, who was admitted as an expert witness in the valuation of companies. He testified to being an educational specialist, specializing in evaluating for-profit colleges, having performed two formal valuations and approximately 40–50 informal valuations.

Mr. Pollak's expert opinion included a valuation of the S Corporations, as a whole, as of December 10, 2012, and a valuation of each S Corporation individually, as of December 14, 2012. Mr. Pollak met with management, toured various college campuses, reviewed financial statements and other data, and created his own set of financial projections. Since Mr. Pollak valued 100% equity interests in the S Corporations, his FMV determinations are based on the values of the controlling interests in the S Corporations.

Mr. Pollak used comparable companies analysis, comparable transactions analysis, and DCF analysis on the S Corporations as a whole to determine the overall FMV. Under a comparable companies analysis, Mr. Pollak estimated an FMV of $594 million, under a comparable transactions analysis he estimated an FMV of $516.5 million, and under a DCF analysis he found an FMV of $748.5 million. He assigned a different weight to each of these values and found a weighted average estimate of $663.5 million. He rounded this figure down to $660 million and then subtracted $39.2 million for the net

[*15] amount of receivables held by the S Corporations. On the basis of these calculations, Mr. Pollak determined an overall FMV of $621 million for the S Corporations.

On cross-examination Mr. Pollak acknowledged he was only generally aware of the Transaction's structure and acknowledged that he had not reviewed the Merger Agreements, the Purchase Notes, and other documents relating to the Transaction.

B.    *Matt Connors*

Matthew Connors, a certified public accountant and a forensic accountant with RMA, was called by Mr. Barney at trial and accepted as an expert in business evaluations. Mr. Connors performed an appraisal, dated September 12, 2013, and determined that the S Corporations had an FMV of $700 million as of November 30, 2012.

On cross-examination Mr. Connors acknowledged that his appraisal used the DCF method for valuation, and he generally projected income growth by the Colleges over the near term through 2017. This growth was based in large part on the Colleges' financial projections he received.

C.    *Carl S. Saba*

Respondent offered as an expert witness Carl S. Saba, a partner at Hemming Morse LLP, who was accepted as an expert in the field of business valuation and debt instruments. Mr. Saba has extensive business valuation experience regarding educational institutions, debt instruments, and notes. Mr. Saba opined that the S Corporations had an FMV of $289 million as of December 31, 2012, but he did not determine an FMV for each S Corporation individually.

Mr. Saba determined the FMV using the DCF method and the guideline public company method. Using the DCF method, he determined an FMV of $286 million; using the guideline public company method, he determined an FMV of $294 million. He then weighted and rounded these FMVs—giving the most weight to the DCF method—to arrive at his determined FMV of $289 million.

The guideline public company method estimates the value of an entity by comparing it to publicly traded companies with similar characteristics. Mr. Saba found 14 companies to use in his analysis, all of which were the subject of a HELP Committee Report titled *For Profit*

[*16] *Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success*. Mr. Saba admits "there were no perfect comparables to" the S Corporations. Mr. Saba used his analysis of these companies to adjust the financial projections prepared by the S Corporations' management. He found that the financial projections prepared by management were overly optimistic. Further, Mr. Saba did not apply a control premium to his valuation because the value he determined was a control value.

To apply the DCF and guideline public company methods, Mr. Saba performed a financial review of the S Corporations. He determined that the S Corporations saw increasing revenues and profit margins during the Great Recession. However, their revenues and profit margins began to decrease in the two years before the Transaction, and the for-profit college industry as a whole experienced a similar trend. Mr. Saba admitted that the S Corporations had faster revenue growth than their peers from 2007 to 2010 and were more profitable than their peers from 2008 to 2010. He also stated that the for-profit college industry was predicted to experience growth and profitability again during the period from 2013 to 2017. Mr. Saba determined that the S Corporations would not have been able to stay in business if they could no longer access Title IV funding.

He opined that the value of the Purchase Notes is related to the value of the S Corporations; however, the restrictions in the NPA would further reduce the value of the S Corporations to below his estimated FMV. Mr. Saba opined that CEHE would use cashflows from the operations of the S Corporations as the primary source for payment of the Purchase Notes. Therefore, the S Corporations' ability to generate cashflow was a key consideration in CEHE's ability to make required loan payments. The S Corporations' ability to generate cashflows in the future would also affect their FMV. Mr. Saba, however, ultimately adopted the same probable case scenario found in the Willamette Report to reach his overall conclusion of value and in rebuttal of the Barrington Appraisal.

Mr. Saba also reviewed the Barrington Appraisal. He disagreed with Mr. Pollak's marketing adjustments made to lost revenue and normalizing adjustments made to historic net income; he concludes these adjustments caused the FMV of the S Corporations to be overstated. Mr. Saba also disagreed with Mr. Pollak's use of a 40% control premium under the guideline public company method.

**[*17]** Mr. Saba also reviewed the RMA Appraisal. He found that the growth rates assumed by Mr. Connors to occur by 2017 were overly optimistic and substantially above the growth rates actually experienced by the S Corporations from 2005 to 2012. He also criticized the appraisal's analysis of transactions as comparable when those transactions occurred during more favorable market conditions. Mr. Saba noted that the Blue Report's review of the Barrington Appraisal was limited by the information Blue received.

D.    *Stuart C. Gilson*

In rebuttal respondent called Stuart C. Gilson, a professor of finance at Harvard Business School. Professor Gilson was accepted as an expert witness in the field of business valuation and debt instruments. Using the DCF method, he opined that the S Corporations had an FMV between $328.5 million and $342.7 million. Alternatively, using a comparable company multiples valuation analysis, he concluded the S Corporations had an overall FMV between $198.3 million and $200.5 million He did not determine an FMV for each S Corporation individually and ultimately concluded that the S Corporations range in FMV between $200 million and $300 million.

Professor Gilson concluded it was inappropriate to add a control premium in valuing the S Corporations. Professor Gilson's values "reflect the fact that CollegeAmerica was a non-traded privately held company," and "it would be reasonable in principle to apply a liquidity discount to CollegeAmerica's estimated value." Professor Gilson thus concluded that his values should be "interpret[ed] . . . as upper bounds on what CollegeAmerica's actual value is."

With respect to the Willamette Report Professor Gilson concluded that Willamette's application of a discount for lack of marketability is "arbitrary and based on faulty reasoning." After correcting what he determined to be faulty assumptions found in the Willamette Report, Professor Gilson opined that the FMV of the Purchase Notes was between $266 million and $267 million.

E.    *Stephanie Cellini*

Stephanie Cellini, a professor of economics at George Washington University, appeared on respondent's behalf. She was accepted as an expert in the for-profit college industry. Professor Cellini did not offer an opinion on the FMV of the S Corporations.

**[*18]** Professor Cellini explained that students at for-profit colleges tend to receive Title IV federal student loans at a much higher rate than their peers at nonprofit entities. During the 2011–12 academic year for-profit colleges enrolled 9.4% of students in the country, but they received 20.3% of the Title IV funds distributed. In summary, she stated: "Title IV funds play a more prominent role at for-profit colleges."

All institutions of higher education—for-profit and nonprofit entities—must follow strict regulatory requirements to continue obtaining Title IV funds. These regulatory requirements include demonstrating financial responsibility by adhering to financial ratios called "composite scores." To determine an institution's financial "composite score," the Department of Education analyzes factors such as equity, primary reserve, and net income ratios and outstanding debt payments. In addition to financial responsibility, all institutions must meet "cohort default rate" thresholds as well. The cohort default rate measures the percentage of students in a cohort who default on their student loans within two years of entering loan repayment.

For-profit colleges are subject to additional requirements to gain Title IV funds. One such requirement is the "90-10 Rule." The total share of revenue that a for-profit college may receive from Title IV programs is 90% of its total revenue. In 2010 the Department of Education first proposed the "Gainful Employment Rule," which after being implemented, sought to require for-profit colleges to demonstrate certain student outcomes regarding debt-to-earnings and loan repayment rates.

An institution would face suspension or termination of its Title IV program participation if it failed to meet the Department of Education's regulatory or certification requirements. Professor Cellini asserted that enrollment at for-profit colleges is highly responsive to changes in the regulatory environment. Furthermore, Professor Cellini argues that significant risks and uncertainty regarding the outlook for enrollment and finances of for-profit colleges existed before and during the Transaction. Professor Cellini asserted that future growth in enrollment at the Colleges was likely limited.

OPINION

I.  *Jurisdiction*

As we have repeatedly stated, the Tax Court is a court of limited jurisdiction, and we may exercise jurisdiction only to extent permitted

**[\*19]** by Congress. *Savage v. Commissioner*, 112 T.C. 46 (1999); *Henry Randolph Consulting v. Commissioner*, 112 T.C. 1, 4 (1999); *Trost v. Commissioner*, 95 T.C. 560, 565 (1990); *Judge v. Commissioner*, 88 T.C. 1175, 1180–81 (1987). Generally speaking, we have jurisdiction when a taxpayer timely files a petition in response to the issuance by the Commissioner of a Notice of Deficiency. I.R.C. §§ 6212 and 6213; Rule 13(a).

Insofar as our jurisdiction regarding overpayments is concerned, section 6512(b)(1) provides that if we determine that there is no deficiency and further determine that the taxpayer has made an overpayment of income tax for the same taxable year, we shall have jurisdiction to determine the amount of such an overpayment. *See Winn-Dixie Stores, Inc. v. Commissioner*, 110 T.C. 291, 295 (1998). Our overpayment jurisdiction stems from our jurisdiction to ultimately "redetermine the correct amount of the deficiency even if the amount so redetermined is greater [or less] than the amount of the deficiency," and if there is no deficiency and we further determine that the taxpayer "has made an overpayment of income tax for the same taxable year," then that amount shall be refunded (or credited) to the taxpayer. *See* I.R.C. §§ 6214(a), 6512(b)(1); *Barton v. Commissioner*, 97 T.C. 548, 552 (1991).

Respondent has issued a Notice of Deficiency determining that Mr. Barney is liable for an income tax deficiency for 2012, and Mr. Barney timely filed a Petition disputing this deficiency and claiming he made an overpayment. Therefore, we have jurisdiction and are required to decide whether there is a deficiency for the 2012 tax year. *See Estate of Baumgardner v. Commissioner*, 85 T.C. 445, 448 (1985). It logically follows that we equally have jurisdiction to determine whether Mr. Barney has made an overpayment of income tax for the same tax year. *See* I.R.C. § 6512(b); *Barton*, 97 T.C. at 552.

II.    *Legal Standards*

Our proceedings for redetermination of a tax deficiency are conducted de novo. I.R.C. § 6214; *see Greenberg's Express, Inc. v. Commissioner*, 62 T.C. 324, 328 (1974). Our determination as to Mr. Barney's tax liability must be made on the merits of the case and not any previous record developed while his return was under examination with the IRS. *See Clapp v. Commissioner*, 875 F.2d 1396, 1403 (9th Cir. 1989); *Greenberg's Express*, 62 T.C. at 327–28.

**[*20]** Ordinarily, a taxpayer bears the burden of proving that the Commissioner's determination is erroneous. Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). A taxpayer must also prove entitlement to any deductions claimed. *See INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992); *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934). Mr. Barney therefore generally bears the burden of proving his entitlement to the charitable contribution deduction under the applicable provisions of section 170 and the values of the S Corporations donated and sold, as well as the burden of establishing an overpayment was made.

Mr. Barney disputes this general burden and cites decisions of the U.S. courts of appeals and section 7491(a)(1) and (2). Mr. Barney contends that the burden has shifted to respondent.

The resolution of the issues in this case, however, do not turn on which party bears the burden of proof. "In a case where the standard of proof is preponderance of the evidence and the preponderance of the evidence favors one party, we may decide the case on the weight of the evidence and not on an allocation of the burden of proof." *Knudsen v. Commissioner*, 131 T.C. 185, 189 (2008), *supplementing* T.C. Memo. 2007-340. Seeing no evidentiary ties, we will resolve the issues on the preponderance of the evidence. *See id.*; *Bordelon v. Commissioner*, T.C. Memo. 2020-26, at *11.

III.    *Summary of the Parties' Arguments*

    A.    *Respondent's Argument*

Respondent contends Mr. Barney is not entitled to deduct his claimed noncash charitable contributions or transfers of CCI and CADI to CEHE in 2012. More specifically, respondent contends that Mr. Barney did not relinquish dominion and control over the S Corporations, submit qualified appraisals, or make "gifts" since the transfers were subject to reclamation, and finally, that Mr. Barney's contributions (or transfers) of the S Corporations to CEHE were equal to the consideration received. Respondent further contends that Mr. Barney is liable for an accuracy-related penalty for a valuation misstatement and/or negligence.

In addressing the refund claim respondent contends that Mr. Barney correctly reported gain based on the stated face values of the Purchase Notes received and that the notes are not contingent debt instruments. Finally, respondent contends that Mr. Barney's settlement

**[*21]** in 2015 does not permit him to amend his 2012 tax return and retroactively adjust his income as originally reported.

### B.    *Mr. Barney's Argument*

Mr. Barney contends that the deficiency determination respondent made on the basis of Mr. Barney's original return is invalid and that he is due a refund for tax year 2012. Mr. Barney goes on to contend that he is entitled to deduct a charitable contribution since he made qualifying charitable contributions—substantiated under the Code—of CCI and CADI to CEHE in 2012. Mr. Barney also asserts that the renegotiation of the promissory notes received was a valid purchase price reduction under section 108 or, in the alternative, the notes were contingent debt instruments under the applicable Treasury regulations.

### IV.    *Analysis*

A key issue before the Court is whether the Transaction was a bargain sale. On the one hand, respondent argued that Mr. Barney transferred his interest in the S Corporations, through CBLT, to CEHE and therefore correctly reported capital gain of $431 million on the basis of the Purchase Notes received. On the other hand, respondent contends that Mr. Barney did not make a completed gift and is not entitled to a charitable contribution deduction. We acknowledge that the standard to determine whether Mr. Barney is entitled to deduct a noncash charitable contribution consists of a number of elements such as relinquishing dominion and control and whether the transfer was subject to reclamation; however, we also note that the issues are interrelated in determining whether the Transaction was in fact a bargain sale.

Considering the above, to resolve whether the Transaction was in fact a bargain sale, we must first determine the values of the S Corporations transferred and the consideration received by Mr. Barney.

### A.    *Bargain Sales as Donations*

Section 170(a)(1) allows a taxpayer a deduction for any charitable contribution made during the taxable year, so long as the taxpayer complies with "regulations prescribed by the Secretary." Generally, the amount of a charitable contribution deduction under section 170(a) for a donation of property other than money is the FMV of the property at the time of the donation. Treas. Reg. § 1.170A-1(c)(1); *see also Triumph*

**[\*22]** *Mixed Use Invs. III, LLC v. Commissioner*, T.C. Memo. 2018-65, at \*28; *Seventeen Seventy Sherman St., LLC v. Commissioner*, T.C. Memo. 2014-124, at \*18.

A charitable contribution deduction is allowed under section 170 for a part-sale, part-gift (bargain sale) made to a charitable organization. *See also* I.R.C. § 1011(b) (acknowledging bargain sales). Generally speaking, the transferor recognizes taxable gain on the sale over her adjusted basis and is entitled to deduct the excess of the property's FMV over the sale price. *See* Treas. Reg. §§ 1.1001-1(e), 1.1011-2.

B.       *Valuation of a Noncash Charitable Contribution Through a Bargain Sale*

"Contributions of property 'generally cannot constitute a charitable contribution if the contributor expects a substantial benefit in return.'" *Seventeen Seventy*, T.C. Memo. 2014-124, at \*19 (quoting *United States v. Am. Bar Endowment*, 477 U.S. 105, 116 (1986)); *see also Emanouil v. Commissioner*, T.C. Memo. 2020-120, at \*45. According to the Supreme Court, the "relevant inquiry" focuses on "whether the transaction . . . is structured as a *quid pro quo* exchange." *Hernandez v. Commissioner*, 490 U.S. 680, 701–02 (1989). We do not inquire into the taxpayer's subjective motives, instead giving weight to "the external features of the transaction." *Costello v. Commissioner*, T.C. Memo. 2015-87, at \*26–27. "If it is understood that the property will not pass to the charitable recipient unless the taxpayer receives a specific benefit, and if the taxpayer cannot garner that benefit unless he makes the required 'contribution,' the transfer does not qualify the taxpayer for a deduction under section 170." *Id.* at \*27.

In determining whether there was a quid pro quo exchange, "the relevant question is whether the taxpayer expected a benefit in return for the payment; deductibility does not depend on what type of benefit the taxpayer received." *Triumph*, T.C. Memo. 2018-65, at \*31 (quoting *Christiansen v. Commissioner*, 843 F.2d 418, 420 (10th Cir. 1988)); *see also Seventeen Seventy*, T.C. Memo. 2014-124, at \*23–24 ("Medical, educational, scientific, religious, or other benefits can be consideration that vitiates charitable intent.").

However, "a taxpayer may still deduct a contribution of property if (1) the value of the property transferred . . . exceeds the [FMV] of any goods or services received in exchange and (2) the excess payment is

[*23] made 'with the intention of making a gift.'" *Triumph*, T.C. Memo. 2018-65, at *29 (quoting *Am. Bar Endowment*, 477 U.S. at 117); *Seventeen Seventy*, T.C. Memo. 2014-124, at *19; Treas. Reg. § 1.170A-1(h)(1). In this instance taxpayers may deduct the difference between the FMV of the contributed property and that of the goods or services provided by the charitable organization. *Boone Operations Co. v. Commissioner*, T.C. Memo. 2013-101, at *15.

1. *Was Mr. Barney's Transfer of the S Corporations a Bargain Sale or Was It a Disguised Sale?*

Respondent determined that no gift was made since Mr. Barney did not intend to contribute more value to CEHE than he received in return. In support of this argument respondent argues we must assess the entire Transaction and determine that Mr. Barney never intended to give any portion of the S Corporations to CEHE. Mr. Barney contends CADI and CCI were donated to CEHE, while bargain sales of SHC, CAAI, and CASI were made under the Merger Agreements since the transfers were for less than FMV. Mr. Barney further contends that objective donative intent is the only relevant factor here; and after considering the issues of control, he has made a completed transfer of his interests in the S Corporations to CEHE.

In his Reply Brief respondent, considering the overall Transaction, argues that Mr. Barney has not made a charitable contribution. Respondent points to consideration of $432 million, the face amount of the Purchase Notes, and continued control over CEHE as evidence that Mr. Barney never intended to make a gift.

To help answer the question of whether a bargain sale occurred we will first determine the FMVs of the S Corporations.

2. *What Were the FMVs of the S Corporations at the Time of the Transaction?*

The FMV of property on a given date is a question of fact to be resolved on the basis of the entire record. *McGuire v. Commissioner*, 44 T.C. 801, 806–07 (1965); *Kaplan v. Commissioner,* 43 T.C. 663, 665 (1965). Treasury Regulation § 1.170A-1(c)(2) defines FMV to be "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts."

**[\*24]** To show the FMVs of the S Corporations the parties have offered the reports and testimony of expert witnesses. *See* Rule 143(g). "Opinion testimony of an expert is admissible if and because it will assist the trier of fact to understand evidence that will determine a fact in issue," and we evaluate expert opinions "in light of the demonstrated qualifications of the expert and all other evidence of value." *Parker v. Commissioner*, 86 T.C. 547, 561 (1986) (first citing Fed. R. Evid. 702; then citing *Estate of Christ v. Commissioner*, 480 F.2d 171, 174 (9th Cir. 1973), *aff'g* 54 T.C. 493 (1970); and then citing *Anderson v. Commissioner*, 250 F.2d 242, 249 (5th Cir. 1957), *aff'g in part and remanding* T.C. Memo. 1956-178). Where experts offer competing estimates of FMV, we decide how to weight those estimates by, among other things, examining the factors they considered in reaching their conclusions. *See Casey v. Commissioner*, 38 T.C. 357, 381 (1962). We are not bound by the opinion testimony of any expert witness, and we may accept or reject expert testimony in the exercise of our sound judgment. *Helvering v. Nat'l Grocery Co.*, 304 U.S. 282, 294–95 (1938); *Estate of Newhouse v. Commissioner*, 94 T.C. 193, 217 (1990). We may also reach a decision as to the value of property that is based on our own examination of the evidence in the record. *See Silverman v. Commissioner*, 538 F.2d 927, 933 (2d Cir. 1976), *aff'g* T.C. Memo. 1974-285.

The Barrington Appraisal valued the S Corporations for a total of $620.8 million. Although the RMA Appraisal and the Blue Report did not value any S Corporation individually, these reports supported the conclusions of the Barrington Appraisal. The RMA Appraisal valued the S Corporations at nearly $80 million more than the Barrington Appraisal. The Blue Report determined an FMV range for the S Corporations which was consistent with the Barrington Appraisal.

Respondent's experts found an FMV for the S Corporations much different from the amounts reported by the S Corporations and ultimately Mr. Barney on his tax return. Mr. Saba found an FMV of $289 million, and Professor Gilson determined an FMV range of $200 million to $300 million.

Respondent, on brief, contends the maximum collective FMV for the S Corporations was $342.7 million and the Purchase Notes received by Mr. Barney are worth at least $211 million. Respondent points us to Mr. Saba's observed restrictions found in the Purchase Notes, which "restricted how CEHE could run CollegeAmerica." And his testimony that certain terms in the NPA were "very restrictive" and "[did not]"

**[\*25]** reflect what I typically see as fairly standard terms between a borrower and lender."

Mr. Barney disputes respondent's FMV appraisals and on brief argues for the values determined in the Barrington Appraisal. Mr. Barney contends that these FMVs, as originally reported, are well supported and were corroborated by Mr. Connors with RMA and the due diligence report rendered by Blue to CEHE. Mr. Barney also argues that Mr. Saba reviewed documents which were not available as of 2012, and he did not consult the S Corporations' management. We disagree with Mr. Barney here. Mr. Saba stated he had sufficient data and information to value the S Corporations despite his lack of access to management.

After consideration of the evidence before us, we find Mr. Barney's original FMVs—based on the Barrington Appraisal—to be excessive and self-serving. Both Mr. Pollak's and Mr. Connors's conclusions as to values were based in part upon management's unreasonable optimistic projections. We find these opinions to be unreliable and out of line with industry practice and then-present market conditions. Any true third party considering acquisition of the S Corporations would not rely on internal management projections to arrive at a purchase price. Rather the third party would obtain an independent valuation using comparable business sales or a more vetted and reliable DCF model.

Rather, we find in valuing the S Corporations that it was far more reasonable to apply a conservative income projection which is reflective of the struggles facing the for-profit college industry from early 2009. These economic struggles and political headwinds were publicly known and evidenced through investigation initiated by the HELP Committee, the promulgation of the Higher Education Opportunity Act, and Department of Education regulations, all affecting Title IV funding—which was approximately 80% of the Colleges' funding.

We find Professor Gilson performed substantial research on the for-profit college industry and was knowledgeable in current market trends and other difficulties facing the industry. Although he had the benefit of hindsight, his use of general industry figures is far more compelling and reliable to us. Respondent has not definitively sought a value on brief, but he offers us a range of values. Mr. Barney has offered no other opinions of FMV than the original Barrington Appraisal. We will therefore adopt Professor Gilson's highest value of $300 million as the overall FMV for the S Corporations. Our conclusion of overall FMV

**[*26]** is bolstered by Mr. Saba's FMV determination of $289 million, which is less than a 5% difference.

3.      *What Was the FMV of the Consideration Received by Mr. Barney at the Time of the Transaction?*

Having determined the collective FMV for the S Corporations to be $300 million at the time of the Transaction, we now turn to the question of what consideration Mr. Barney received under the Transaction.

As outlined in the Findings of Fact, the S Corporations originally reported capital gain realized of $608,869,455 and deducted charitable contributions of $180,922,213, which is the approximate difference between the overall FMV determined in the Barrington Appraisal and the face amounts of the Purchase Notes and other purchase price adjustments. Mr. Barney first cites section 108(e)(5) and contends that the 2015 Confidential Settlement Agreement wherein he agreed to cancel Contingent Note B and amend Contingent Note A constitutes a purchase price reduction of $356 million at the end of the tax period.[5] Mr. Barney acknowledges that the negotiation and reduction of the Contingent Notes occurred in 2015; however, he contends that this change must be applied to his 2012 tax liability because there is no other way to effect a purchase price reduction. We disagree with Mr. Barney.

Section 108(e)(2) provides that no income shall be realized from the discharge of indebtedness to the extent that payment of the liability would have given rise to a deduction. Section 108(e)(2) generally applies as an exception for the buyer—not the seller—which would make the statute inapplicable. Furthermore, section 108(e)(5) provides an exception for when a money debt reduction shall be treated as a valid purchase price reduction and not as a discharge of debt when certain conditions are met. In any event we determine that section 108(e)(5) is not applicable for Mr. Barney.

Mr. Barney voluntarily elected out of the installment method despite being a cash basis taxpayer and entitled to report gain as

---

[5] This amount represents the difference between the face amount of the Purchase Notes and the face amount of the $75 million Contingent Notes, as amended, which were accepted in substitution for the Purchase Notes.

**[\*27]** payments are received.[6] He reported the entire transaction and gain for tax year 2012 despite receiving only Purchase Notes as consideration. Each tax year stands on its own,[7] and we find it entirely inappropriate to apply a purchase price adjustment for 2012 on the basis of events occurring in 2015.[8]

Furthermore, CEHE approached Mr. Barney only after a request for a letter of credit was received from the Department of Education equal to 50% of the Title IV funding. CEHE's board of directors sought Mr. Barney's forgiveness of "a significant portion of CEHE's debt" which was deemed necessary to retain Title IV funding. These facts are confirmed in Mr. Juhlin's letter dated May 22, 2015, to the Department of Education. On the basis of these undisputed objective facts, we find Mr. Barney voluntarily forgave the indebtedness (i.e., made a gift), and the parties did not negotiate a reduction in the purchase price of the S Corporations or otherwise renegotiate the terms of the Transaction.

Considering the foregoing, we decline to apply a purchase price reduction to the amount Mr. Barney realized under the Transaction for tax year 2012.

Next, Mr. Barney contends that the Purchase Notes are contingent debt instruments under Treasury Regulation § 1.1275-4 and

---

[6] It is undisputed that the Transaction qualifies for installment treatment. *See* Treas. Reg. § 15a.453-1(a). The term "installment sale" means a disposition of property where at least one payment is to be received after the close of the taxable year in which the disposition occurs. *See id.* para. (b)(1). Mr. Barney, however, elected out of the installment method, and respondent has denied Mr. Barney's subsequent request to revoke this prior election. *See* I.R.C. § 453(d)(3); *Jacobs v. Commissioner*, 224 F.2d 412 (9th Cir. 1955), *aff'g* 21 T.C. 165 (1953).

[7] *See United States v. Skelly Oil Co.*, 394 U.S. 678, 684 (1969); *ATL & Sons Holdings, Inc. v. Commissioner*, 152 T.C. 138, 147 (2019); *Koprowski v. Commissioner*, 138 T.C. 54, 60 (2012); *Flora v. Commissioner*, 47 T.C. 410, 413 (1967); *see also Martin v. Commissioner*, T.C. Memo. 2021-35, at \*22; *Larkin v. Commissioner*, T.C. Memo. 2020-70, at \*62, *aff'd*, No. 21-1103, 2022 WL 994768 (D.C. Cir. Apr. 1, 2022); *McMillan v. Commissioner*, T.C. Memo. 2019-108, at \*15; *Becker v. Commissioner*, T.C. Memo. 2018-69, at \*44; *Bon Viso v. Commissioner*, T.C. Memo. 2017-154, at \*9 n.8; *O'Neal v. Commissioner*, T.C. Memo. 2016-49, at \*40 n.6.

[8] The claim of right doctrine is a well-established principle of federal income taxation, and we find it to be generally applicable here. *See, e.g.*, *Healy v. Commissioner*, 345 U.S. 278, 281–82 (1953); *United States v. Lewis*, 340 U.S. 590, 591–92 (1951). Under the doctrine, a taxpayer must determine its income at the end of the tax year without regard to possible subsequent events. *See Lewis*, 340 U.S. at 592; *Egolf v. Commissioner*, 87 T.C. 34, 48 (1986); *Schultz v. Commissioner*, 59 T.C. 559, 564 (1973).

[*28] that he therefore overstated the amount realized in the Transaction by $254 million.[9] Mr. Barney points out that payments under the Purchase Notes were contingent upon the future performance of the Colleges as managed by CEHE. Second, Mr. Barney points out that the Purchase Notes initially bore a fixed 1% interest rate; however, this rate floated (or changed) with the Consumer Price Index for All Urban Consumers or CPI–U.

Respondent disagrees and contends the Purchase Notes are precluded from being considered contingent debt instruments on the basis of the express wording in the applicable regulations. Respondent primarily argues the Purchase Notes Mr. Barney received are not contingent debt obligations since the provision that converts the Purchase Notes from a fixed interest rate to a floating interest rate is too "remote," and therefore, this term should be disregarded. *See* Treas. Reg. § 1.1275-2(h)(2). Contingencies that are "remote" can be disregarded under the regulations. *Id.*

We do not find the parties' arguments compelling. At the end of the day, Mr. Barney transferred his interests in the S Corporations and reported the Transaction as a bargain sale. We decline to follow respondent's one-sided argument that the FMV of the S Corporations was approximately $300 million but that Mr. Barney realized $421 million on the Transaction as originally reported. We find respondent's argument inconsistent.

In his Reply Brief Mr. Barney goes on to contend that we should set aside the dispute surrounding the application of the Treasury regulations, as initially raised on brief, and instead focus on the text of section 1001(b) to determine the amount realized under the Transaction. We agree with Mr. Barney on this point, and accordingly we refrain from deciding whether the Purchase Notes are contingent debt instruments under Treasury Regulation § 1.1275-4.

The failure of a taxpayer to properly record a transaction during the tax year and thereafter does not prevent the correction of the error, especially under the circumstances of this case. *See Phila. Park Amusement Co. v. United States*, 126 F. Supp. 184, 189 (Ct. Cl. 1954) (citing *Countway v. Commissioner*, 127 F.2d 69 (1st Cir. 1942), *vacating and remanding* 44 B.T.A. 921 (1941)). Similarly, it is the substance of a

---

[9] This figure is the difference between the fair market value of $177 million, as determined by Willamette, and the original face values of the Purchase Notes.

**[\*29]** transaction, not its form, which "controls the characterization of a taxable transaction." *Hardman v. United States*, 827 F.2d 1409, 1411 (9th Cir. 1987) (citing *Gregory v. Helvering*, 293 U.S. 465, 469–70 (1935)).

The parties do not dispute that Mr. Barney realized an amount under the Transaction during tax year 2012. *See Watson v. Commissioner*, 69 T.C. 544, 549–52 (1978), *aff'd*, 613 F.2d 594 (5th Cir. 1980); *W. Oaks Bldg. Corp. v. Commissioner*, 49 T.C. 365, 376 (1968); *Ennis v. Commissioner*, 17 T.C. 465, 470 (1951); *Joyner Family Ltd. P'ship v. Commissioner*, T.C. Memo. 2019-159; *Griffith v. Commissioner*, 73 T.C. 933, 937 (1980). The dispute here lies over how to value the Purchase Notes. *See generally* Treas. Reg. § 1.1001-1(a), (e).

In this case we find the Code unambiguous and therefore controlling. Under section 1001(a), Mr. Barney's gain from the Transaction equals the excess amount realized on the sale over its adjusted basis. The amount realized is the sum of money received plus the FMV of property (other than money) received. *Id.* subsec. (b). A promissory note is property other than money for purposes of section 1001(b). *McShain v. Commissioner*, 71 T.C. 998, 1004 (1979).

Both parties acknowledge the foregoing principles and point to the testimony from Charles Wilhoite, who prepared the original Willamette Report. In the Willamette Report the FMVs of the Purchase Notes, after 10% and 20% discounts for lack of marketability, were $103 million to $105 million for Note A and $72 million for Note B. Respondent disputes the application of discounts to the Purchase Notes and points to five factors as support for eliminating the applied discounts. Respondent essentially contends that application of the discounts used by the Willamette Report would be "double counting" since these same discounts were already applied to the cashflow projections used to determine the CEHE repayment obligations. Professor Gilson opined that the Willamette Report's use of a liquidity discount was appropriate in valuing the Purchase Notes; however, he found that the Willamette Report's application of a discount for lack of marketability was arbitrary and based on faulty reasoning.

We agree with Professor Gilson and find his testimony to be credible, as it was based on his substantial research on the for-profit college industry and knowledge in market trends. Accordingly, we will adopt Professor Gilson's overall conclusions that the Purchase Notes' FMV is $267 million.

[*30] Respondent does make another compelling argument on brief, namely, that Mr. Barney's transfer of the S Corporations was a single integrated Transaction. Respondent contends that we must consider the "entire contractual arrangement" to assess whether the assets transferred had a combined FMV exceeding that which Mr. Barney received in exchange. We agree with respondent on this point.

We therefore determine that the amount realized under the integrated Transaction was $267 million, which is the collective FMV of the Purchase Notes as determined by Professor Gilson. *See Goldstein v. Commissioner*, 89 T.C. 535, 548 (1987). Having determined that the amount realized, $267 million, is less than the FMV of the S Corporations transferred under the Transaction, $300 million, we hold the Transaction qualifies as a bargain sale; albeit for an amount less than originally reported.

C.      *Whether Mr. Barney Is Entitled to Deduct a Noncash Charitable Contribution for Tax Year 2012*

Respondent raises several arguments against Mr. Barney's claimed noncash charitable contribution deduction. We will address respondent's arguments in logical order.

Respondent first contends Mr. Barney failed to relinquish dominion or control over the transferred S Corporations and thus no completed gift was made. To support this argument respondent points us to Mr. Barney's "power to direct the disposition or manner of enjoyment of the Colleges in numerous ways." First, he became the sole member of CEHE after the Transaction, giving him sole authority to appoint and remove the board of directors. Second, he controlled the operations of the Colleges as a creditor, holding negative covenants under the Purchase Notes, including veto rights over large capital expenditures. Respondent argues these rights gave Mr. Barney extensive control even after the purported gift of the Colleges to CEHE.

It is well settled that the term "charitable contribution" as it is used generally in section 170 and the regulations thereunder is synonymous with the term "gift." *See Collman v. Commissioner*, 511 F.2d 1263, 1267 (9th Cir. 1975), *aff'g in part, rev'g in part and remanding* T.C. Memo. 1973-93; *Seed v. Commissioner*, 57 T.C. 265, 275 (1971); *Sutton v. Commissioner*, 57 T.C. 239, 242 (1971); *Wolfe v. Commissioner*, 54 T.C. 1707, 1713 (1970); *Murphy v. Commissioner*, 54 T.C. 249, 252 (1970); *McLaughlin v. Commissioner*, 51 T.C. 233, 234

[*31] (1968), *aff'd*, 23 A.F.T.R.2d (RIA) 69-1763 (1st Cir. 1969); *Perlmutter v. Commissioner*, 45 T.C. 311, 316–17 (1965); *DeJong v. Commissioner*, 36 T.C. 896, 899 (1961), *aff'd*, 309 F.2d 373 (9th Cir. 1962); *Stjernholm v. Commissioner*, T.C. Memo. 1989-563, *aff'd*, 933 F.2d 1019 (10th Cir. 1991). And we have regularly said that a deduction under section 170 is allowed only if the transfer at issue satisfies the six essential elements of a bona fide inter vivos gift:

> (1) a donor competent to make the gift; (2) a donee capable of taking the gift; (3) a clear and unmistakable intention on the part of the donor to absolutely and irrevocably divest himself of the title, dominion, and control of the subject matter of the gift, in praesenti; (4) the irrevocable transfer of the present legal title and of the dominion and control of the entire gift to the donee, so that the donor can exercise no further act of dominion or control over it; (5) a delivery by the donor to the donee of the subject of the gift or the most effectual means of commanding the dominion of it; [and] (6) acceptance of the gift by the donee.

*Goldstein*, 89 T.C. at 541–42 (quoting *Weil v. Commissioner*, 31 B.T.A. 899, 906 (1934), *aff'd*, 82 F.2d 561 (5th Cir. 1936)); *accord Guest v. Commissioner*, 77 T.C. 9, 15–17 (1981); *Stjernholm*, T.C. Memo. 1989-563. In sum, the essential elements of a gift are that there be donative intent, delivery by the donor, and acceptance by the donee. *Goldstein*, 89 T.C. at 542.

We disagree with respondent's argument that the bargain-sale Transaction lacks "donative intent." Mr. Barney undoubtedly desired for the Colleges to become nonprofit entities, and he arranged for their transfer to CEHE to achieve this goal. We view Mr. Barney's role within CEHE as not conclusive of his continued ownership, but rather, as meeting his goals for the Colleges to continue as nonprofit entities, while equally retaining creditor rights. *See Musgrave v. Commissioner*, T.C. Memo. 2000-285, slip op. at 7, 12–14 (holding under a contract for deed that the taxpayers' retained legal rights to the transferred property as collateral; the transfer, however, was still deemed a bargain sale and completed gift for federal tax purposes).

We find Mr. Barney's testimony regarding his intent to transfer the Colleges and their conversion into nonprofit entities to be credible. He plainly understood the strong head winds facing the for-profit industry. Mr. Barney also sought to sell in 2009, but because of the

**[\*32]** Great Recession the potential sale fell apart. Mr. Barney also discussed other obstacles facing the industry, including the HELP Committee hearings, the Harkin Reports, changes to Title IV funding, and new regulations issued by the Department of Education. We equally find Mr. Barney's objective charitable intent is evidenced through his meetings and collaboration with Dr. Fransen in early 2011.

Respondent has not argued that CEHE is a sham or that it should not otherwise be respected as a nonprofit entity. In other words, other than some ancillary right to salary as a director of CEHE, Mr. Barney was not entitled to receive any portion of the profits derived from the S Corporations since they were now under the ownership and control of CEHE, a nonprofit entity. Respondent has presented no evidence refuting these basic premises.

Moreover, Mr. Barney reported the transfer as a sale and reported, in part, substantial gain resulting from the Transaction. We therefore find, at least with respect to the practical implications of the Transaction, that the transfer of control and ownership of the S Corporations from Mr. Barney, through CBLT, to CEHE was made for charitable purposes. Respondent has not presented evidence that Mr. Barney—while sole shareholder of the S Corporations—personally benefited or otherwise continued to receive profits from the Colleges after the merger into CEHE.

Both parties cite our decision in *Palmer v. Commissioner*, 62 T.C. 684, 694 (1974), *aff'd*, 523 F.2d 1308 (8th Cir. 1975), in which we held the transfer of a for-profit college was a completed gift. Like the taxpayers in *Palmer*, Mr. Barney was subject to similar fiduciary responsibilities and exercised some level of control over CEHE. However, also as in *Palmer*, respondent has not presented evidence reflecting a violation of those duties or his continued personal use and enjoyment of the transferred property. *See id.*; *cf. Viralam v. Commissioner*, 136 T.C. 151 (2011) (holding that the taxpayer retained dominion and control over property transferred to his charitable foundation through personal loans received); *Pollard v. Commissioner*, 786 F.2d 1063 (11th Cir. 1986), *aff'g* T.C. Memo. 1984-536. Accordingly, we do not find respondent's objections to Mr. Barney's role in CEHE to be compelling and otherwise sufficient to negate his completed gift. *See Palmer*, 62 T.C. at 694.

**[\*33]** Next, respondent contends that Mr. Barney did not submit a qualified appraisal and therefore is not entitled to a charitable contribution deduction.

Section 170(f)(11) imposes, for charitable contribution deductions, heightened substantiation requirements on taxpayers, depending on the value of the contribution. Section 170(f)(11) provides that for deductions greater than $500,000, a taxpayer must attach "a description of such property," obtain "a qualified appraisal of such property," and "attach[] to the return for the taxable year a qualified appraisal of such property." I.R.C. § 170(f)(11)(A)(i), (B), (C), (D).

Treasury Regulation § 1.170A-13(c)(3)(ii) provides that a "qualified appraisal" must contain, among other things, the following information: (1) a description of the property; (2) the date(s) on which the property was appraised; (3) the property's FMV; (4) the method used to value the property; and (5) the specific basis for the valuation and a justification of that basis. Specifically, respondent contends that the Barrington Appraisal fails to comply with the elements found in Treasury Regulation § 1.170A-13(c)(3)(ii)(D), which provides as follows:

> (D) The terms of any agreement or understanding entered into (or expected to be entered into) by or on behalf of the donor or donee that relates to the use, sale, or other disposition of the property contributed, including, for example, the terms of any agreement or understanding that—
>
> (*1*) Restricts temporarily or permanently a donee's right to use or dispose of the donated property,
>
> (*2*) Reserves to, or confers upon, anyone (other than a donee organization or an organization participating with a donee organization in cooperative fundraising) any right to the income from the contributed property or to the possession of the property, including the right to vote donated securities, to acquire the property by purchase or otherwise, or to designate the person having such income, possession, or right to acquire, or
>
> (*3*) Earmarks donated property for a particular use . . . .

**[\*34]** On brief respondent contends that the Barrington Appraisal fails to account for the provisions under the NPA restricting operations within the S Corporations without Mr. Barney's consent and that 75% of the excess cashflow or 10% of revenues were dedicated to repayment of the obligations under the Purchase Notes.

Although we ultimately discount the conclusions reached by Mr. Pollak in the Barrington Appraisal as being based in part on unreasonable management estimates, we cannot conclude that the report, as a whole, is unqualified and lacks substantial compliance with the applicable Treasury regulations. *See Bond v. Commissioner*, 100 T.C. 32, 38–41 (1993).

Respondent cites some of our prior opinions, namely *Costello*, T.C. Memo. 2015-87, at \*19; *Braen v. Commissioner*, T.C. Memo. 2023-85, at \*36–38; and *Alli v. Commissioner*, T.C. Memo. 2014-15, at \*24–27. We find these cases to be distinguishable since they involve apparent contractual restrictions on the donation. *See Costello*, T.C. Memo. 2015-87, at \*19 ("[The] appraisal omits any mention of the facts that petitioners conveyed an easement to Howard County and that they were required to convey that easement as a condition of being permitted to sell their development rights . . . ."). Here, we have already stated that the contractual limitations facing CEHE under the NPA, and more generally the Transaction, are ordinary restrictions facing any seller-financed arrangement.[10] Therefore, we cannot conclude that Mr. Pollak's failure to expressly set forth these limitations in the Barrington Appraisal (which respondent considers to be material to his analysis) result in its being an "unqualified appraisal" under section 170(f)(11)(D).

After considering respondent's arguments, we hold that Mr. Barney is entitled to deduct a noncash charitable contribution for the Transaction for tax year 2012.

---

[10] The terms under the Transaction here are complex since they involve a bargain sale. In valuing a donation of property the appraiser usually examines what rights (if any) the donor has retained. Respondent is questioning the financing arrangement between Mr. Barney and CEHE to assure repayment under the Purchase Notes, which admittedly are intertwined with and affect the FMV of the S Corporations transferred. However, in examining these terms it cannot be said whether (or not) they materially impact the appraiser's conclusions, particularly when more than one approach to value is being used to reach an overall opinion of value.

**[\*35]** V.  *Conclusions as to Respondent's 2012 Adjustments*

Since we have determined, as of 2012, that the FMV for the S Corporations transferred is $300 million and the consideration received is $267 million, the Transaction remains a bargain sale, that is, a part sale and part donation. Accordingly, we will overrule in part and sustain in part respondent's disallowance of Mr. Barney's Schedule A noncash charitable contribution deduction of $132,428,708.[11]

Respondent determined that Mr. Barney is liable for an accuracy-related penalty equal to 40% of an underpayment of tax required to be shown on a return attributable to a gross valuation misstatement. *See* I.R.C. § 6662(a), (b)(3), (e), (h). In the alternative, respondent contends Mr. Barney is liable for a 20% accuracy-related penalty based on a substantial valuation misstatement and/or negligence or disregard of rules or regulations. *See* I.R.C. § 6662(a), (b)(1), (3). On the basis of the foregoing, we are not certain an underpayment was made. Therefore, we will refrain from determining in this Memorandum Opinion whether there is an underpayment and whether a penalty is due until after updated computations are furnished.

Similarly, we will refrain from determining whether Mr. Barney has made an overpayment for tax year 2012 until computations are furnished. If necessary, we will issue an opinion reaching a determination as to the remaining issues.

To reflect the foregoing,

*An appropriate order will be issued.*

---

[11] The parties do not dispute respondent's adjustment of $35,991,175 on Schedule E, Supplemental Income and Loss, for the unrealized receivables which must be reclassified as ordinary income. Respondent's corresponding capital gain and loss adjustment to Mr. Barney's return of −$35,991,175, however, should be increased by the difference between the amount of capital gain originally reported and the capital gain determined in this Memorandum Opinion.